STATE OF NORTH CAROLINA v. CERRON THOMAS HOOKS

No. 89A00

(Filed 20 July 2001)

**1. Criminal Law— reasonable doubt—instructions—academic doubt—ingenuity of counsel**

There was no plain error in a first-degree murder prosecution where the trial court's definition of reasonable doubt included the statements "it's not an academic doubt" and "nor . . . doubt suggested by the ingenuity of counsel." Although defendant argued that the "academic doubt" phrase effectively instructed the jury to forego intellectual analysis, the phrase in context would be interpreted by an ordinary jury to mean that a mere theoretical or speculative doubt is insufficient to constitute reasonable doubt. The "ingenuity of counsel phrasing, contended by defense counsel to be an instruction to ignore his closing argument, in context refers to a doubt created by the ingenuity of counsel that is not supported by the evidence.

**2. Sentencing— capital—aggravating circumstances—especially heinous, atrocious or cruel—sufficiency of the evidence**

There was sufficient evidence in a capital sentencing proceeding to submit the aggravating circumstance that the murder was especially heinous, atrocious, or cruel where a jury could infer from the evidence that the victim was aware of his impending death but was helpless to prevent it, and defendant's decision to kick, pistol-whip and taunt his felled and dying victim showed an unusual depravity of mind and a physically agonizing and unnecessarily torturous death. N.C.G.S. § 15A-2000(e)(9).

**3. Sentencing— capital—mitigating circumstances—mental or emotional disturbance—substance abuse**

The trial court did not err in a capital sentencing proceeding by not submitting as a mitigating circumstance that defendant committed the murder under the influence of mental or emotional disturbance where defendant's expert testified that defendant had primitively developed skills for emotional expression, social connection, and adult functioning as a result of the early onset of chronic substance dependence and that both marijuana abuse and alcohol dependence are mental disorders. Notwithstanding the American Psychiatric Association's listing of alcohol

**STATE v. HOOKS**

[353 N.C. 629 (2001)]

and drug abuse as mental disorders, voluntary intoxication is not a mental disturbance for the (f)(2) mitigating circumstance and the trial court did not err by submitting instead the (f)(6) circumstance of impaired capacity.

### 4. Sentencing— capital—victim impact statement

The trial court did not err in a capital sentencing proceeding by allowing the victim's older brother to state in a victim impact statement that the victim was easygoing; gave everything 110 percent; wanted to make something of himself; was loving, kind, and respectful; had accepted Jesus Christ after a neighbor had died of a heart attack; and left a favorable impression on everyone he met. The testimony as a whole showed that the victim was a living human being with aspirations, fears, a family, and friends; the fleeting comment regarding acceptance of Jesus Christ briefly addressed the religious facet of the victim's life and did not inflame the jury.

### 5. Sentencing— capital—death sentence—not arbitrary

The record fully supports the aggravating circumstances found by the jury in a capital sentencing proceeding and the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary consideration.

### 6. Sentencing— capital—death sentence—proportionate

A death sentence was not disproportionate considering all the circumstances, including the senseless nature of the crime and defendant's shocking behavior as the victim lay dying, and that this case was more similar to cases in which a death sentence was found proportionate than to those in which a death sentence was found disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Greeson, J., on 9 February 2000 in Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 16 May 2001.

**STATE v. HOOKS**

[353 N.C. 629 (2001)]

*Roy A. Cooper, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General, and Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant.*

PARKER, Justice.

Defendant Cerron Thomas Hooks was indicted on 19 October 1998 for the first-degree murder of Michael Miller. Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury recommended a sentence of death; and the trial court entered judgment accordingly.

The State's evidence tended to show that on 5 September 1998 the victim invited friends to a pool party at the apartment complex where the victim resided. Shortly after the party started, defendant went to the pool area and joined the gathering. Defendant was drinking beer at the pool, although witnesses testified that he did not appear to be intoxicated. Around 9:30 that night, the victim invited the guests at the pool back to his apartment to continue the party.

Later that night, the victim's roommate saw defendant playing outside the apartment with a .45-caliber "automatic" pistol equipped with a laser scope. A short time later defendant returned to the apartment and began looking for a shirt that he had taken off in the apartment earlier in the evening. The victim told defendant that he had not seen the shirt and that he would return it to a mutual friend should he find it later. Defendant then "got loud" and began searching the apartment for his shirt, eventually entering the victim's closed bedroom. The victim told defendant that defendant "can't disrespect his house" and asked defendant to leave. While defendant was walking towards the door to leave, he and the victim "had words" back and forth, culminating in defendant telling the victim just outside the front door, "you ain't going to disrespect me in front of them bitches."

As defendant was walking down the stairs outside the apartment, the victim followed defendant down to the ground level to make sure that he left. Defendant and the victim continued arguing face to face at the bottom of the stairs. Defendant stated that he was going to "f—k [the victim] up." The victim began backing away, and defendant pulled a .38-caliber handgun from his pocket and pointed

it at the victim's face. The victim said, "Oh, you're going to shoot me now"; and after a "silent moment," defendant shot the victim four times.

The victim fell to the ground; and defendant began kicking him in the face and chest, pistol-whipping him, and taunting him by saying, "you thought I was playing, you thought I was playing." Defendant then fled the scene. The victim remained conscious and in obvious extreme pain for at least fifteen minutes after the shooting while a neighbor administered aid. Officers with the Winston-Salem Police Department apprehended defendant on 8 September 1998. At the time, defendant, with a fully loaded nine-millimeter Luger in his hand, was crouching behind a retainer wall at the top of a stairwell.

The medical examiner who autopsied the victim's body found four gunshot entry wounds: one in the face, which broke the victim's jaw and went through his tongue; one in the abdomen, which traveled through the victim's liver; one in the victim's left arm, which traveled completely through the arm; and one in the upper back, fragments of which lodged in the victim's neck and cheek. The victim died approximately twelve hours after the shooting as a result of the gunshot wounds.

## GUILT-INNOCENCE PHASE

[1] In his only assignment of error relating to the guilt-innocence phase of the trial, defendant contends that the trial court committed plain error while instructing the jury by defining reasonable doubt in a manner that was legally incorrect and that lowered the State's burden of proof. We disagree.

The trial court gave the following instruction defining reasonable doubt:

> Now, a reasonable doubt, members of the jury, means exactly what it says. It's not a mere possible, it's not an academic and it's not a forced doubt. There are few things in human experience which are beyond all doubt or which are beyond a shadow of a doubt, nor is it a doubt suggested by the ingenuity of counsel for either side or even by your own ingenuity of mind, not legitimate or warranted by the evidence and the testimony you've heard in this case. Of course, your reason and your common sense would tell you that a doubt wouldn't be reasonable if it was founded upon or suggested by any of these type [sic] of considerations.

STATE v. HOOKS

[353 N.C. 629 (2001)]

A reasonable doubt is a doubt based on reason and common sense arising out of all or some of the evidence—excuse me, out of some or all of the evidence that has been presented or the lack of or insufficiency of the evidence as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

We initially note that "[a]bsent a specific request, the trial court is not required to define reasonable doubt, but if the trial court undertakes to do so, the definition must be substantially correct." *State v. Miller,* 344 N.C. 658, 671, 477 S.E.2d 915, 923 (1996). Furthermore,

so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v. Virginia,* 443 U.S. 307, 320, n.14[, 61 L. Ed. 2d 560, 574, n.14] (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky,* 436 U.S. 478, 485-86[, 56 L. Ed. 2d 468, 475] (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States,* 348 U.S. 121, 140[, 99 L. Ed. 150, 167] (1954).

*Victor v. Nebraska,* 511 U.S. 1, 5, 127 L. Ed. 2d 583, 590 (1994). Upon appeal "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Id.* at 6, 127 L. Ed. 2d at 591.

The trial court gave defendant numerous opportunities to object to the jury instructions outside the presence of the jury, and each time defendant indicated his satisfaction with the trial court's instructions. Having failed to object to this instruction at trial, defendant did not properly preserve this issue for review; therefore, we review the record to determine whether the instruction constituted plain error. N.C. R. App. P. 10(b)(2); *State v. Hardy,* 353 N.C. 122, 131, 540 S.E.2d 334, 342 (2000).

Under a plain error analysis, defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result. *State v. Collins,* 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). "[E]ven when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has

STATE v. HOOKS

[353 N.C. 629 (2001)]

been made in the trial court.' " *State v. Odom*, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378 (1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)). Furthermore, in reviewing jury instructions this Court has stated:

> " 'The charge of the court must be read as a whole . . . , in the same connected way that the judge is supposed to have intended it and the jury to have considered it . . . .' *State v. Wilson*, 176 N.C. 751, [754-55,] 97 S.E. 496[, 497] (1918). It will be construed contextually, and isolated portions will not be held prejudicial when the charge as [a] whole is correct. If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal."

*State v. Rich*, 351 N.C. 386, 393-94, 527 S.E.2d 299, 303 (2000) (quoting *State v. Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970) (citations omitted)) (alterations in original).

Defendant acknowledges that various versions of the above instruction have been upheld in other cases. *See State v. Lambert*, 341 N.C. 36, 52, 460 S.E.2d 123, 132-33 (1995); *State v. Adams*, 335 N.C. 401, 420, 439 S.E.2d 760, 770 (1994). However, defendant argues that those cases upheld the instructions on other grounds and did not explicitly approve the language defendant finds objectionable here. Assuming *arguendo* that defendant's interpretation of the bases underlying the holdings in *Lambert* and *Adams* is correct, we decline to find plain error in the language about which defendant complains.

Defendant first contends that the phrase "it's not an academic doubt" lessens the State's burden of proof. Defendant cites a definition from the 1995 edition *Microsoft Bookshelf*, a computer reference source, as evidence that the word "academic" normally relates to school, higher education, learning, and scholarship.[1] Thus, defendant argues, this phrase effectively instructs the jury to forgo intellectual analysis in reviewing the evidence. However, defendant's own cited authority also defines "academic" as "scholarly to the point of being unaware of the outside world" and "theoretical or speculative without a practical purpose or intention." *American Heritage Dictionary*

---

1. Our research discloses that *Microsoft Bookshelf* (1995 ed.) utilized *American Heritage Dictionary* (3d ed.) as its source. We have verified the definition using *American Heritage Dictionary* (3d ed.).

9 (3d ed. 1992). Furthermore, the cited definition suggests the words "pedantic" and "theoretical" as possible synonyms. *Id.*

The phrase in question, when read in context, would, in our judgment, be interpreted by an ordinary juror to mean that a mere theoretical or speculative doubt is insufficient to constitute reasonable doubt. Immediately before the phrase in question—"it's not an academic"—the trial judge stated, "[i]t's not a mere possible." Immediately afterwards the trial judge stated, "its not a forced doubt." Thus, we conclude that no reasonable likelihood exists that the jury, considering this instruction as a whole, would have applied the instruction in an unconstitutional manner. *See Victor*, 511 U.S. at 6, 127 L. Ed. 2d at 591.

Defendant also contends that the phrase "nor is it a doubt suggested by the ingenuity of counsel" directs the jury to ignore the closing arguments of defendant's counsel. We have previously held that this phrase is not erroneous. *State v. Bishop*, 346 N.C. 365, 399-400, 488 S.E.2d 769, 787-88 (1997). In this case the sentence containing the objectionable phrase ends with the following qualifying language not present in the instruction in *Bishop*: "not legitimate or warranted by the evidence and the testimony you've heard in this case." When read in context, this phrase instructs the jury that a doubt created by the ingenuity of counsel that is not supported by the evidence is not a reasonable doubt. Therefore, as this phrase is the same as in *Bishop*, except for a limiting qualification, we decline to find error. For these reasons, we find this assignment of error to be without merit.

## SENTENCING PROCEEDING

[2] By another assignment of error, defendant contends that the trial court committed prejudicial error by submitting as the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1999), in that the evidence was insufficient to warrant submission of this aggravating circumstance. We disagree.

"Whether the trial court properly submitted the (e)(9) aggravating circumstance depends upon the particular facts and circumstances of this case." *State v. Holman*, 353 N.C. 174, 181, 540 S.E.2d 18, 23 (2000). Furthermore, "we must consider the evidence in the light most favorable to the State; and the State is entitled to every reasonable inference to be drawn therefrom." *State v. Fleming*, 350 N.C. 109, 119, 512 S.E.2d 720, 729, *cert. denied*, 528 U.S. 941, 145 L. Ed. 2d 274 (1999). Contradictions in the evidence pertaining to the aggravat-

ing circumstance are for the jury to resolve. *State v. Stanley*, 310 N.C. 332, 339, 312 S.E.2d 393, 397 (1984).

This Court has categorized several types of murders which meet the especially heinous, atrocious, or cruel criteria:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328[, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18] (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985)[, *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)], including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

*State v. Gibbs*, 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). In this case the evidence, when viewed in the light most favorable to the State, reveals that this murder falls within the scope of each of the above categories.

First, the evidence permits the inference that the killing was physically agonizing to the victim. After shooting the victim four times, defendant repeatedly kicked and pistol-whipped the helpless victim. The victim was conscious and in extreme pain for at least fifteen minutes after the shooting and assault, attempting to talk despite his broken jaw and wounded tongue. *See Brown*, 315 N.C. at 67, 337 S.E.2d at 828 (holding that evidence that the victim was conscious for fifteen minutes after being shot six times supports a finding that the victim suffered great physical pain prior to death).

Further, the evidence permits the inference that the murder was conscienceless and pitiless, leaving the victim in his last moments aware of but helpless to prevent impending death. Defendant's kicking, pistol-whipping, and taunting his felled victim showed a complete lack of conscience and pity. Moreover, a juror could reasonably infer that the victim knew that death was imminent and that he was

helpless to prevent it during the "silent moment" between defendant's pointing the gun at the victim's face and the first shot. The length of time during which the victim fears for his life may qualify despite any brevity. *See State v. Sexton*, 336 N.C. 321, 374, 444 S.E.2d 879, 909 (holding that a reasonable juror could infer that the victim feared for her life in the ten seconds it took her to lose consciousness), *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). Additionally, the evidence shows that the victim was conscious and in great pain for at least fifteen minutes after the shooting, thereby permitting the inference that he was also aware of, but helpless to prevent, impending death after the shooting. *See Brown*, 315 N.C. at 67, 337 S.E.2d at 828 (holding that where the dying victim remained conscious for fifteen minutes the evidence was sufficient to show that the victim knew that he was dying but was helpless to prevent it).

Finally, the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder. Defendant demonstrated unusual depravity of mind as he told the victim he was going to "f—k him up," pointed the gun in his face as the victim was backing away, waited a "silent moment," and then shot him four times over such trivial matters as a missing shirt and perceived disrespect. After shooting the victim, defendant scoffed at him by saying, "you thought I was playing" while kicking the victim about the face and upper body. This decision by defendant to taunt and continue assaulting the victim as he lay helplessly bleeding to death on the ground at defendant's feet further evinces defendant's lack of remorse and unusual depravity of mind. *See State v. Robinson*, 342 N.C. 74, 86-87, 463 S.E.2d 218, 225-26 (1995) (holding that evidence that defendant robbed the victim after killing him showed a lack of remorse), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996).

Defendant cites numerous cases where this Court has held that the evidence was insufficient to submit the (e)(9) aggravator. However, upon reviewing those cases and remaining mindful that "[w]hether the trial court properly submitted the (e)(9) aggravating circumstance depends upon the particular facts and circumstances of this case," *Holman*, 353 N.C. at 181, 540 S.E.2d at 23, we find that the cases cited are factually distinguishable and, thus, not controlling in this case.

Defendant first cites *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981). In *Hamlette* the defendant, after drinking beer for most of

the evening, shot the victim in the back of the head three times for no apparent reason as the victim was using a payphone, then fled the scene. *Id.* at 504, 492, 276 S.E.2d at 347, 340. The victim, who did not know he was about to be attacked, lingered for twelve days before dying. *Id.* at 504, 276 S.E.2d at 347. The Court ruled that submission of the (e)(9) aggravator to the jury on these facts was error. *Id.*

Next, defendant cites *Stanley*, 310 N.C. 332, 312 S.E.2d 393. In *Stanley*, the Court found submission of the (e)(9) circumstance improper where the defendant shot his wife nine times from a passing car while she was walking along a sidewalk. *Id.* at 340, 312 S.E.2d at 398. Defendant then drove to a police station and surrendered. *Id.* at 341, 312 S.E.2d at 398. The medical evidence was that the victim was unconscious within minutes, though death was not instantaneous. *Id.* at 340, 312 S.E.2d at 398. The Court deemed this evidence to be insufficient to show prolonged suffering for purposes of (e)(9). Furthermore, the Court held that the evidence was insufficient to support a reasonable inference that the victim knew she was about to be shot. *Id.*

Defendant next relies upon *Hamlet*, 312 N.C. 162, 321 S.E.2d 837. In *Hamlet* the defendant ambushed the victim, shot him numerous times, and fled the scene. *Id.* at 165-66, 321 S.E.2d at 840-41. The Court held that the evidence was insufficient to submit the (e)(9) aggravating circumstance, as no evidence suggested that the victim knew he was about to be shot or that he remained conscious after the first shot. *Id.* at 175-76, 321 S.E.2d at 846.

Defendant also contends that *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), is substantially similar to the present case. In *Oliver* the Court held that where the defendant fatally shot a clerk while robbing a convenience store, then shot a bystander as the defendant was running from the store, the (e)(9) aggravating circumstance was improperly submitted as to the bystander, who had pulled up to the gas pump and died instantaneously. *Id.* at 61, 274 S.E.2d at 204.

Finally, defendant argues that the case of *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984), is similar to the case at bar. In *Moose*, the defendant followed the victim's car, honking his horn and bumping the other car. *Id.* at 485, 313 S.E.2d at 510. When the victim stopped his car, he stated, "Oh, God, what are they going to do." *Id.* at 495, 313 S.E.2d at 516. The defendant then shot the victim from inside his own car. *Id.* The Court held the victim's statement showed merely general

apprehension rather than a fear of death. *Id.* at 495-96, 313 S.E.2d at 516.

Defendant argues that the present case is similar to *Moose*, as the shooting was the result of a sudden escalation in the argument. However, this contention ignores the evidence that defendant told the victim he was going to "f—k [him] up" and the evidence of the "silent moment" when the gun was pointed at the victim's face before he was shot. Thus, assuming *arguendo* that the victim's statement in this case, "Oh, you're going to shoot me now," is properly interpreted as incredulity rather than fear, other evidence would permit a jury reasonably to infer that the victim feared for his life. Therefore, we do not find *Moose* persuasive or controlling on the issue in this case.

Based on the evidence in the instant case, a jury could reasonably infer that the victim was aware of impending death but was helpless to prevent it. Furthermore, defendant's behavior, namely, his decision to kick, pistol-whip, and taunt his felled and dying victim, shows an unusual depravity of mind and a physically agonizing and unnecessarily torturous death that was not present in the cases cited by defendant. When taken in the light most favorable to the State, the evidence supports a finding that the murder was especially heinous, atrocious, or cruel as previously defined by this Court. *See Gibbs*, 335 N.C. at 61-62, 436 S.E.2d at 356. Accordingly, we hold that the trial court properly submitted the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance to the jury. Therefore, this assignment of error is overruled.

**[3]** In another assignment of error, defendant contends that the trial court erred in failing to submit the (f)(2) mitigating circumstance, that defendant committed the murder under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2).

A trial court must submit all mitigating circumstances supported by substantial evidence. *State v. Strickland*, 346 N.C. 443, 463, 488 S.E.2d 194, 206 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). A trial court must do so regardless of whether submission is requested by the defendant. *State v. Holden*, 338 N.C. 394, 407, 450 S.E.2d 878, 885 (1994). The burden is on the defendant to provide this substantial evidence. *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

As to the mitigating circumstance that the defendant was under the influence of a mental or emotional disturbance at the time of the offense, N.C.G.S. § 15A-2000(f)(2), this Court has stated:

Defendant's mental and emotional state *at the time of the crime* is the central question presented by the (f)(2) circumstance. *State v. McKoy*, 323 N.C. 1, 28-29, 372 S.E.2d 12, 27 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The use of the word "disturbance" in the (f)(2) circumstance "shows the General Assembly intended something more . . . than mental impairment which is found in another mitigating circumstance [N.C.G.S. § 15A-2000(f)(6)]." *State v. Spruill*, 320 N.C. 688, 696, 360 S.E.2d 667, 671 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988).

*State v. Geddie*, 345 N.C. 73, 102-03, 478 S.E.2d 146, 161 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997).

In this case defendant's expert witness, Dr. Tyson, testified that defendant "didn't suffer from an impairing mental disorder such as psychosis or mental retardation, any condition that would have grossly impaired his ability to function on a day to day basis." However, Dr. Tyson further opined that defendant had primitively developed skills for emotional expression, social connection, and adult functioning as a result of the early onset of chronic substance dependence. Dr. Tyson concluded that "the combination of substance dependence and the impoverished skills for adult functioning combined such that his ability to think through his behavior, to consider the consequences of his actions, to reasonably plan or to understand and appreciate the connection between his actions and consequent events would have been impaired at the time of the offense." Dr. Tyson opined that defendant's impoverished skills for functioning in adult life were in large part the result of "the early onset of substance dependence and the ongoing substance dependence into his adult life."

After considering the above testimony, the trial court refused to submit the (f)(2) mitigating circumstance, that defendant was under the influence of mental or emotional disturbance at the time of the offense, choosing instead to submit the (f)(6) mitigating circumstance, that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Defendant urges this Court to hold that the testimony

was sufficient to warrant submission of the (f)(2) mitigating circumstance. We decline to do so.

Defendant contends that this case is similar to *State v. Greene*, 329 N.C. 771, 408 S.E.2d 185 (1991), in which the Court found the evidence to be sufficient to submit the (f)(2) mitigator where the evidence showed that the defendant's "organic brain damage" had left him with little foresight and poor impulse control and that these deficiencies were exacerbated by alcohol consumption. *Id.* at 775, 408 S.E.2d at 186-87. According to an expert witness, the defendant was likely to lose control and act violently when aroused by anger or frustration. *Id.* at 775, 408 S.E.2d at 187. After consuming alcohol, the defendant killed his father out of anger over the possibility of being disinherited. *Id.* at 775, 408 S.E.2d at 186.

We do not find *Greene* to be controlling in this case. The evidence in *Greene* showed that the defendant may have been under an emotional disturbance at the time of the crime, rather than just having general emotional or mental impairments. There, the defendant's mental problems, when coupled with his drinking and anger at his father, led to an overwhelming emotional disturbance at the time of the crime. By contrast, nothing in the evidence in the present case suggests that defendant suffered any emotional or mental disturbance at the time of the offense beyond his general mental deficiencies.

In our view this case is analogous to *Geddie*, 345 N.C. 73, 478 S.E.2d 146. In *Geddie* the defendant relied upon expert testimony that he lacked coping skills, was a substance abuser, and was a victim of child abuse in contending that the (f)(2) mitigator should have been submitted. *Id.* at 102, 478 S.E.2d at 161. Finding the evidence insufficient, this Court held that the evidence presented in support of the (f)(2) mitigator did not show that the defendant was under the influence of a mental or emotional disorder or disturbance at the time of the crime. *Id.* at 103, 478 S.E.2d at 161. The Court further approved the trial court's submission of the (f)(6) mitigator rather than the (f)(2) mitigator based on this evidence. *Id.* at 102, 478 S.E.2d at 161.

The evidence presented in this case tended to show that defendant's impoverished skills, which resulted from chronic substance abuse, led to poor impulse control and a failure to understand the consequences of his actions. Thus, as we held in *Geddie*, we hold that

this evidence showed diminished capacity rather than any mental disturbance at the time of the killing.

Defendant emphasizes that, when asked whether this murder was committed while defendant was under the influence of a mental or emotional disturbance at the time, Dr. Tyson responded, "Yes. . . . Both marijuana abuse and alcohol dependence are considered mental disorders. He also would have been seen as suffering from a personality disorder, a failure to develop adult functioning skills at the time of the offense." Dr. Tyson later explained that "[a]lcohol dependence and marijuana or cannabis abuse are both listed as mental disorders in the Diagnostic and Statistical Manual of the American Psychiatric Association."

Notwithstanding the American Psychiatric Association's listing alcohol and drug abuse as mental disorders, this Court has consistently held that voluntary intoxication is not a mental disturbance for purposes of the (f)(2) mitigating circumstance. *See, e.g., Geddie,* 345 N.C. at 103, 478 S.E.2d at 161-62. As discussed above the evidence in this case did not establish a mental or emotional disturbance supporting submission of the (f)(2) mitigator. On this record the trial court did not err by failing to submit the (f)(2) mitigating circumstance and submitting instead the (f)(6) mitigating circumstance for the jury's consideration. *See State v. Syriani,* 333 N.C. 350, 395, 428 S.E.2d 118, 142-43 (holding that (f)(6) applies where there is evidence of "some mental disorder . . . to the degree that it affected the defendant's ability to understand and control his actions."), *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Accordingly, we find this assignment of error to be without merit.

**[4]** Defendant next argues that the trial court erred in allowing the prosecutor to offer a victim-impact statement that exceeded the allowable scope of such statements. Defendant objected to the testimony of the victim's older brother, who testified that the victim was easygoing; gave everything "110 percent"; wanted to make something of himself; and was loving, kind, and respectful. The witness further testified that the victim had accepted Jesus Christ after a neighbor died of a heart attack and that the victim left a favorable impression on everyone he met.

Victim-impact evidence is admissible in a capital sentencing proceeding unless the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee,* 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991). The victim-impact statement may

"flesh[] out the humanity of the victim so long as it does not go too far." *State v. Reeves*, 337 N.C. 700, 723, 448 S.E.2d 802, 812 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995). The prosecutor cannot ask the jury to impose the death penalty because the victim was a good person. *Id.* Defendant argues that the testimony in this case went too far as it implied that anyone who kills a well-mannered young man who has accepted Jesus Christ is more deserving of the death penalty than someone whose victim has not made such a religious choice. We disagree.

The testimony in question constituted a small portion of the State's overall case and did no more than " 'remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society and in particular to his family.' " *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735 (quoting *Booth v. Maryland*, 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457 (1987) (White, J., dissenting), *overruled by Payne*, 501 U.S. 800, 115 L. Ed. 2d 720). The fleeting comment regarding the victim's acceptance of Jesus Christ briefly addressed the religious facet of the victim's life and did not inflame the jury to sentence defendant to death because the victim was a Christian. The testimony as a whole showed that the victim was a living human being with aspirations, fears, a family, and friends. This testimony did not go beyond the bounds of proper victim-impact evidence. *See State v. Bowman*, 349 N.C. 459, 478, 509 S.E.2d 428, 439-40 (1998), *cert. denied*, 527 U.S. 1040, 144 L. Ed. 2d 802 (1999). This assignment of error is overruled.

## PRESERVATION ISSUE

Defendant raises one additional issue that he concedes has previously been decided contrary to his position by this Court: whether the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), is unconstitutionally vague and overbroad.

Defendant raises this issue for purposes of urging this Court to reexamine its prior holdings. We have considered defendant's arguments on this issue and conclude that defendant has demonstrated no compelling reason to depart from our prior holdings. This assignment of error is overruled.

## PROPORTIONALITY

[5] Finally, defendant argues that the death sentence imposed in this case is disproportionate to the sentences imposed in similar cases,

considering both the crime and the defendant. This Court has the exclusive statutory duty in capital cases to review the record and determine: (i) whether the record supports the aggravating circumstances found by the jury; (ii) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstance found by the jury. Likewise, we find no suggestion that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Accordingly, we turn to our final statutory duty of proportionality review.

**[6]** Defendant was found guilty of first-degree murder based on premeditation and deliberation. At the conclusion of defendant's sentencing proceeding, the jury found the only aggravating circumstance submitted: that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9).

The jury found two statutory mitigating circumstances: that defendant has no significant prior criminal history, N.C.G.S. § 15A-2000(f)(1), and that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). Two additional statutory mitigating circumstances were submitted to but not found by the jury: the age of defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7), and the catchall statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). Of the eleven nonstatutory mitigating circumstances submitted, the jury found that three had mitigating value: (i) that defendant has no prior history of violence or violent acts, (ii) that defendant has behaved well while in confinement, and (iii) that defendant has shown remorse.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. We have determined the death penalty to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181

(1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Of the seven cases in which we have held the death sentence to be disproportionate, only *Stokes* and *Bondurant* involved the especially heinous, atrocious, or cruel aggravating circumstance. *See State v. Spruill*, 338 N.C. 612, 664, 452 S.E.2d 279, 307 (1994), *cert. denied*, 516 U.S. 834, 133 L. Ed. 2d 63 (1995). The case at hand is distinguishable from *Stokes* in that the Court in *Stokes* emphasized that the record was devoid of evidence suggesting that the defendant was the ringleader. *Stokes*, 319 N.C. at 21, 352 S.E.2d at 664. In this case defendant acted on his own and is solely responsible for his crime. Furthermore, the defendant in *Stokes* was only seventeen years old at the time of the crime, *id.*; whereas, defendant in this case was twenty years old at the time of the crime. We have previously distinguished *Stokes* on this basis. *Robinson*, 342 N.C. at 89, 463 S.E.2d at 227 (holding *Stokes* distinguishable where the defendant was twenty-one years old).

This case also differs substantially from *Bondurant*, where the defendant immediately exhibited remorse and concern for the victim by seeking medical treatment. *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 182-83. Significantly, in the case at hand defendant exhibited no such remorse, deciding instead to further assault and taunt his dying victim after the shooting.

We also consider cases in which this Court has found the death penalty proportionate; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Defendant was convicted of first-degree murder on the basis of premeditation and deliberation. We have noted that " '[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime.' " *State v. Mitchell*, 353 N.C. 309, 331, 543 S.E.2d 830, 834 (2001) (quoting *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)). Furthermore, this Court has held that the (e)(9) aggravating circumstance, standing alone, is sufficient to support a sentence of death. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Although the presence of the (e)(9) aggravating circumstance is not determinative in itself, it is an indication that the death sentence was neither exces-

sive nor arbitrary. *State v. Moseley*, 338 N.C. 1, 64, 449 S.E.2d 412, 450 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995).

Defendant cites numerous cases in which either a jury returned a sentence of life imprisonment or a judge imposed a life sentence when the jury could not reach a unanimous sentencing recommendation. Defendant claims these cases are factually similar to or substantially more heinous, atrocious, or cruel than the case at bar. Such factual similarity, however, is only one part of our proportionality review.

> [T]he fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review. . . . [S]imilarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." [*State v. Williams*, 308 N.C. 47, 80-81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983).] . . . [T]he constitutional requirement of "individualized consideration" as to proportionality [can] only be served if the issue of whether the death penalty [is] disproportionate in a particular case ultimately rest[s] upon the "experienced judgments" of the members of this Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances. Further, the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have "consistently" returned life sentences in factually similar cases.

*State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 46-47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). While the cases cited by defendant give us a point of initial inquiry, our statutory task of proportionality review requires us to make our ultimate determination on the totality of circumstances, not solely on similarities to isolated cases where a jury returned a life sentence.

We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment. Accordingly, after considering all the circumstances including the senseless nature of this murder and defend-

ant's shocking behavior as the victim lay dying, the experienced judgment of this Court is that the death sentence is not disproportionate in this case.

Defendant received a fair trial and capital sentencing proceeding, free from prejudicial error; and the death sentence in this case is not disproportionate. Accordingly, the judgment of the trial court is left undisturbed.

NO ERROR.