An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-35

Filed 17 December 2025

Wilkes County, Nos. 22 CR 000410-960, 22 CR 000503-960, 22 CR 000521-960

STATE OF NORTH CAROLINA,

v.

STACY ELIZABETH MILLER, Defendant.

Appeal by Defendant from judgment entered by Judge L. Todd Burke in Wilkes County Superior Court. Heard in the Court of Appeals on 10 September 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Derrick C. Mertz, for the State.*

> *Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Sam J. Ervin IV, for Defendant–Appellant.*

MURRY, Judge.

Stacy E. Miller (Defendant) appeals the trial court's judgment entered upon her conviction for one count of attempted murder and two counts of first-degree murder. Defendant argues the trial court plainly erred by (1) "allowing the State to elicit testimony from Dr. Martin that impermissibly vouched for Jones's credibility"; (2) "failing to instruct the jury to decide the issue of Defendant's guilt of each of the charges that had been lodged against her separately"; (3) "instructing the jury that it

could find . . . premeditation and deliberation on the grounds that Defendant inflicted lethal wounds upon each victim after she or he had been felled"; (4) "instructing the jury with respect to the felony-murder issues that Defendant killed 'the victim' rather than a specific person other than the alleged victim of the homicides that Defendant had been charged with committing"; and (5) "instructing the jury with respect to the issue of Defendant's guilt of first-degree murder on the basis of the felony-murder rule using the attempted murder of the victim as the predicate felony by failing to define an 'attempt.'" (Brackets omitted.) For the following reasons, we dismiss her evidentiary challenge and hold that she failed to show how the instructional challenges amount to plain error.

## I. Background

This matter arises from the 17 July 2022 murders of Sandra Shew and Ricky Lee Anderson, as well as the attempted murder of Shannon Jones that same day. In July 2022, Shew dated Anderson and lived with Jones at 2747 Hunting Creek Road, North Wilkesboro, North Carolina (the house). At that time, Defendant was homeless and living in her car with her partner, James Robinson. On 16 July 2022, Defendant, Robinson, Jones, Shew, and Anderson drank alcohol and used methamphetamine together at the house.

Early the next morning, Jones awoke to the sound of Defendant and Robinson arguing in the back bedroom. Jones saw Defendant holding a black "cowboy-style" revolver and Robinson holding a small silver pistol. Someone shot Jones twice from

behind, first in her head and then in her hand. Jones did not see who had initially shot her but saw Robinson shoot her for a third time in her chest, at which point Defendant and Robinson fled in Defendant's car.

While calling 911, Jones identified Defendant and Robinson as the shooters and described their car and direction of travel. She told the dispatcher "they shot [her] three times" in the head and hand and that Anderson and Shew "were dead." Police found Jones outside, bleeding from her head and chest. Inside the house, they found Shew dead from a gunshot wound to the head. Anderson was slumped over in the bathtub, alive with a gunshot wound to his head.[1] Jones told the police that Defendant and Robinson had shot her three times and she saw a gun in Defendant's hand "when [she and Robinson] were coming out of the back" of the house. First responders transported Jones to the hospital, where Dr. R. Shayn Martin treated her.

Around 5:49 a.m., Lieutenant Michael Sampson attempted to stop Defendant's car, but it sped away. A police chase ensued. Lieutenant Sampson's dashboard camera recorded Defendant throwing a "cowboy-style" revolver from the passenger-side window. Officers arrested Defendant and Robinson. At the roadside, Defendant spontaneously stated:

> I did everything. Everything is mine. He was just trying to get me away.
> I tossed both of them out. They are mine, he didn't know I had them.
> Don't listen to him. He's a fool. He didn't even know I had the guns until
> I shot the people. He didn't know nothing about it, he freaked out and

---

[1]    Anderson died approximately five days later.

got me out of there.

(Ellipses omitted.) At the police station, Defendant waived her *Miranda* rights and gave a recorded interview, detailing she had shot both Shew and Anderson in the bedroom, had shot Jones in the living room, and discarded both guns while fleeing from police. On 31 October 2022, a grand jury indicted Defendant for two counts of first-degree murder and one count of attempted murder. Defendant pleaded not guilty.

At trial, the State played Defendant's recorded confession and the 911 call in which Jones identified Defendant and Robinson as the shooters, as well as their getaway car. Jones also testified to the same information she conveyed to the police and 911 dispatch. On cross-examination, defense counsel asked Jones about her drug use and medical disclosures at the hospital:

> [DEFENSE COUNSEL]: Now, . . . on this day . . . what drugs had you consumed?
>
> [JONES]: Just the meth.
>
> [DEFENSE COUNSEL]: Well, isn't it true that when they took you to the hospital, that you had amphetamines in your system?
>
> [JONES]: Yes, sir. That's the meth.

Jones also confirmed that she could have "possibly" "had more than meth in [he]r system" but she "didn't smoke it that day."

Dr. Martin also testified as an expert in general trauma surgery. He explained Jones took a routine drug test and completed a questionnaire as part of her medical

treatment. On cross-examination, Defendant's counsel questioned Dr. Martin about whether the test would have conflated methamphetamine with other amphetamines and to what extent it may have reliably shown Jones positive for marijuana and "[a]lcohol use." On redirect, the State asked Dr. Martin about whether Jones "told the truth about" her recent drug use, to which he replied:

> [DR. MARTIN]: We hope so. We . . . let them know to please tell us the truth, so that this is to help them. This is so we can do the right things for them . . . from a withdrawal and then subsequent treatment standpoint.
>
> [STATE]: And she admitted to having, you know, use[d] drugs and that sort of thing?
>
> [DR. MARTIN]: . . . [S]he admitted to combining alcohol with downer medications and these are stated in ways for patients to understand, downers described . . . as benzodiazepines and barbiturates in the last 90 days. She admitted to combining alcohol with drugs of abuse in the last 90 days. And she admitted to being intoxicated in the last 30 days.
>
> [STATE]: And typically when somebody . . . is telling you that sort of information it's because they're telling you the whole truth, because they . . . want . . . get the right type of treatment?
>
> [DR. MARTIN]: We, again, preface this with, "Please tell us the truth, we're not here . . . to make . . . judgments of . . . anything about you. We just need to know the facts, so that we can care for you."

Defendant did not object, and her counsel revisited "the honesty question . . . in regards to [Jones's] drug use" on recross-examination.

Additionally, the State introduced other testimonial and physical evidence. Police officers testified to finding blood throughout the home, consistent with where the victims were shot, and to identifying DNA profiles from those samples that

matched the victims and confirmed the location of each shooting. Forensic technicians testified that the ballistic markings on the gun casings matched the two handguns recovered from the roadside after Defendant's flight from law enforcement. They further testified that the "cowboy-style" revolver recovered contained blood consistent with the victims' profiles and gunshot residue matching the scene.

Defendant testified in her own defense. She said that she fell asleep and woke up to Robinson holding a gun at her and yelling about how he had "f**ked up" by shooting Anderson, Shew, and Jones. In their getaway car, Robinson allegedly recounted "a play-by-play with every little detail" about how and where he shot each victim and that she "had to take this" because his "record is horrible." She complied because he was "a very violent man" and "would end up killing her" if she failed to do so. She also accused Robinson of forcing her to throw the guns out of the window. After testifying she did not go into the bedroom on this night, the State played her recorded confession in which she gave specific details about the murders and said, "[T]hat's a detail that you either had to make up, it's a detail that [Robinson] had to have told you and you have told this jury twice that he never told you that, or you had to be" at the scene.

Several days before the charge conference, the trial court inquired of Defendant as to whether it should instruct the jury on the first-degree murder charges either twice "or read it one time" while "let[ting] the jury know" that it "applies to both verdicts" relating to Shew and Anderson. The State deferred to

defense counsel, who had "no position." Defense counsel offered no "additions" to any of the proposed instructions and confirmed the trial court's intention to include both "murder or attempt[ed] murder" as the two potential underlying offenses in the felony-murder instruction. After closing arguments, the trial court reviewed the felony-murder instructions as to whether the instructions flowed "straight out of" premeditated murder into felony murder (and then back to premeditated murder) as part of the felony-murder instruction. Defense counsel raised no objection to the trial court's stated intention to read each jury instruction as written and proposed between the parties. After the trial court read out the felony-murder instructions in particular, defense counsel affirmed his "content[ment]" with them.

The trial court instructed the jury on attempted murder and two theories of first-degree murder: (1) malice, premeditation and deliberation; and (2) felony murder, using first-degree murder on the basis of malice, premeditation, and deliberation and attempted murder as the predicate felonies. The trial court confirmed the State "must prove beyond a reasonable doubt that [Defendant] is guilty." The trial court clarified that, although Defendant was "charged with two counts of first-degree murder," and the first-degree murder instruction "applie[d] to both counts," it would "only . . . read [the] instruction one time." The trial court reiterated the first-degree murder instruction when instructing on felony murder.

For premeditation and deliberation, the trial court instructed that the jury had to find Defendant had "killed the victim with a deadly weapon" and proximately

caused the victim's death, such that the death otherwise "would not have occurred." It also permitted the jury to infer premeditation and deliberation from Defendant's "infliction of lethal wounds after the victim [wa]s felled." It defined "attempt" as "an act which was calculated and designed to accomplish the crime." Finally, the trial court explained that the jury should convict Defendant of first-degree murder under the felony-murder rule using premeditated and deliberate murder as the predicate felony, if she "intended to kill the victim," and "killed the victim with a deadly weapon" so as to "proximate[ly] cause" the victim's death.

On 6 May 2024, the jury convicted Defendant of one count of attempted murder and two counts of first-degree murder—both based on malice, premeditation, deliberation, and the felony-murder rule. The trial court arrested judgment on Defendant's felony-murder convictions, consolidated the attempted murder into one first-degree murder conviction, and sentenced Defendant to two consecutive sentences of life imprisonment without the possibility of parole. Defendant timely appealed.

## II.    Jurisdiction

This Court has jurisdiction over Defendant's appeal of a final judgment of the trial court under N.C.G.S. §§ 7A-27(b)(1) and 15A-1444(a) because the trial court entered final judgment upon a jury's guilty verdict to which Defendant pled not guilty. *See* N.C.G.S. § 7A-27(b) (2025) (final judgment of a trial court); *id.* § 15A-1444(a) (pled not guilty but found guilty).

### III. Analysis

Defendant "specifically and distinctly," N.C. R. App. P. 10(a)(4), argues on appeal that the trial court plainly erred (1) by allowing Dr. Martin to "impermissibly vouch for Ms. Jones's credibility"; (2) by not instructing the jury that "each of the murder charges . . . had been lodged against her separately"; (3) by instructing the jury "that it could find . . . premeditation and deliberation" regardless of when either victim "had been felled"; (4) by "instructing the jury . . . regarding the felony-murder issues that Defendant killed 'the victim' rather than a specific person other than the alleged victim of the homicides that Defendant had been charged with committing"; and (5) by "instructing the jury . . . regarding Defendant's guilt of first-degree murder on the basis of the felony-murder rule using the attempted murder of Jones as the predicate felony by failing to define an 'attempt.' " (Brackets omitted.) Defendant acknowledges her failure to object to any of these assignments at trial; thus, we review them only for plain error. *See* N.C. R. App. P. 10(a)(1).

For plain error, the defendant must show: (1) the trial court fundamentally erred; (2) "the jury probably would have returned a different verdict" "absent the error"; and (3) "the error is an 'exceptional case' . . . seriously affect[ing] 'the fairness, integrity or public reputation of judicial proceedings.' " *State v. Reber*, 386 N.C. 153, 150 (2024) (quoting *State v. Lawrence*, 365 N.C. 506, 518–19 (2012)). Because this exacting test demands the *near certainty* of a different result, "the strength and volume of the evidence against the defendant plays a role in [our] . . . analysis." *Id.*

at 159, 173–74. For the following reasons, we dismiss her evidentiary challenges and hold that she has failed to show how the instructional challenges amount to plain error.

## A. Evidentiary Challenge

First, Defendant argues that the trial court plainly erred "by allowing the State to elicit testimony from Dr. Martin that impermissibly vouched for Jones'[s] credibility."[2] The State contends Defendant had "opened the door" to this testimony by eliciting the challenged information on cross-examination. For the following reasons, we agree with the State and hold that Defendant waived appellate review.

Only the jury as factfinder can determine the credibility of witnesses. *See State v. Holloway*, 82 N.C. App. 586, 587 (1986). Although an expert witness cannot vouch for the truthfulness of another witness as a result, *see State v. Kim*, 318 N.C. 614, 621 (1986), the State may adduce "evidence not otherwise admissible . . . to explain or rebut evidence elicited by [the] defendant himself," *State v. Albert*, 303 N.C. 173, 177 (1981). A party in a criminal case "open[s] the door" to challenge of "evidence which raises an inference favorable to his case" because the adverse "party has the right to

---

[2]   Nonetheless, presuming *arguendo* any unopened fundamental error by the admission, Defendant still cannot show plain error. *See State v. Reber*, 386 N.C. 153, 162 (2024). The "overwhelming and uncontroverted" evidence of her guilt precludes any reasonable possibility that the jury "would have returned a different verdict" had the trial court excluded Dr. Martin's challenged testimony. *State v. Chavez*, 378 N.C. 265, 270 (2021) (quotation omitted). The State's abundant evidence renders *inconceivable*—much less "probable"—a different verdict reachable by the jury. *Reber*, 386 N.C. at 159. Thus, we hold Defendant would have failed to show plain error on these witness-credibility grounds as well.

explore, explain, or rebut that evidence." *State v. McKoy*, 385 N.C. 88, 96 (2023) (quotation omitted). More specifically, a party may introduce evidence "in explanation or rebuttal" of the opposing party's fact even if "the rebuttal evidence would be incompetent or irrelevant had it been offered initially." *Id.* at 95.

Reviewing Defendant's challenges in the context of "the entire record," the State offered evidence of Defendant's flight from the scene, her disposal of the murder weapons, a roadside confession, a recorded police confession containing specific details of the murders, and Jones's eyewitness testimony. *Reber*, 386 N.C. at 173–74. This evidence, taken together with Defendant's, presented the jury with two potential narratives: either Defendant primarily shot Jones alongside Robinson or slept in her car the entire time until Robinson told her what happened. The State's overwhelming evidence supports the former. After Jones awoke and asked if they were okay, at least Defendant shot her twice and Robinson shot her once in the chest. They then fled the scene while Defendant discarded the weapons along the highway.

Defendant asserts that Dr. Martin "render[ed] the admission of his evidence erroneous" by "essentially validat[ing]" the credibility of her reports of substance use. But on cross-examination, Defendant asked Jones whether she had arrived at the hospital with "amphetamines," "opioids," and "meth" in her system and whether she had truthfully disclosed her drug use to hospital staff. Defendant then cross-examined Dr. Martin about Jones's drug use and hospital disclosures. To rehabilitate Dr. Martin, the trial court permitted the State to redirect Dr. Martin about Jones's

"honest[y]," which Defendant revisited on recross-examination. By questioning Dr. Martin on Jones's truthfulness as to her drug use and hospital disclosures, Defendant "opened the door" for the State to ask "similar or related questions"—including those which may have been otherwise inadmissible. *State v. Mason*, 159 N.C. App. 691, 695 (2003). Defendant opened the door to the challenged portion of Dr. Martin's testimony, thereby waiving appellate review. *See State v. Belfield*, 144 N.C. App. 320, 324 (2001) (holding that a party may not appeal testimony where it first "opened the door" by asking directly related questions). Thus, this Court dismisses her argument.

Nonetheless, presuming *arguendo* Defendant had (1) not opened the door to the challenged testimony and (2) demonstrated that the trial court fundamentally erred by admitting it, she would still fail to show plain error. *See Reber*, 386 N.C. at 162. Given the "overwhelming and uncontroverted" evidence of her guilt, Defendant can show no reasonable possibility that the jury "would have returned a different verdict" had the trial court excluded Dr. Martin's challenged testimony. *State v. Chavez*, 378 N.C. 265, 270 (2021) (quotation omitted). Rather, in light of the State's abundant evidence, it is nearly inconceivable—much less "probable"—the jury would have reached a different verdict. *Reber,* 386 N.C. at 159. As a result, presuming the trial court erred by admitting the challenged portion of Dr. Martin's testimony, Defendant would have failed to show how this purported error amounts to plain error.

## B. Instructional Challenges

Next, Defendant argues the trial court plainly erred by instructing the jury (1)

"to decide the issue of Defendant's guilt of each of the charges" on a purportedly collective basis; (2) "that it could find . . . premeditation and deliberation on the grounds that Defendant inflicted lethal wounds upon Shew and Anderson after she or he had been felled"; (3) that she "killed 'the victim' rather than a specific person" "with respect to the felony-murder issues"; and (4) that, without including a definition of "attempt" "with respect to . . . first-degree murder." (Brackets omitted.) For the following reasons, we disagree on all four counts.

Generally, we review unpreserved jury-instruction challenges for plain error. *See State v. Hooks*, 353 N.C. 629, 633 (2001); N.C. R. App. P. 10(a)(4). Although a specific request for challenged instructions normally invites any resulting error, s*ee State v. McPhail*, 329 N.C. 636, 643–44 (1991), a defendant's "failure to object . . . *alone*" does not, *State v. Doherty*, 293 N.C. App. 685, 692 (2024).

To avoid repetition, we presume Defendant's challenges amount to instructional error and analyze them collectively for plain error. Because the "probable impact" standard of the second prong in the *Reber* test is dispositive, we focus on that analysis. *See Reber*, 386 N.C. at 163. A defendant can meet his burden of showing an erroneous jury instruction "only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Castaneda*, 196 N.C. App. 109, 116 (2009) (quoting N.C.G.S. § 15A-1443(a) (2007)).

As stated above, though, the State's evidence is too strong to suggest the possibility of a different result. In light of this "overwhelming and uncontroverted" evidence against her, Defendant cannot show the error had a probable impact on the jury's guilty verdict. *Chavez*, 378 N.C. at 270 (quotation omitted). Thus, this Court holds the trial court did not plainly err in any of the four challenged jury instructions.

## IV.    Conclusion

For these reasons, this Court dismisses Defendant's evidentiary challenges and holds the trial court did not plainly err in administering any of the four challenged jury instructions.

DISMISSED IN PART; NO PLAIN ERROR IN PART.

Judges TYSON and GORE concur.

Report per Rule 30(e).