NO. COA13-785

NORTH CAROLINA COURT OF APPEALS

Filed:  5 August 2014

STATE OF NORTH CAROLINA

v.

Alamance County
Nos. 11 CRS 51768, 51892

ROBERT ALFONZO CLAPP


Appeal by defendant from judgments entered 5 February 2013 by Judge Shannon Joseph in Alamance County Superior Court. Heard in the Court of Appeals 6 January 2014.


>*Attorney General Roy Cooper, by Assistant Attorney General Margaret A. Force, for the State.*

>*Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for Defendant.*


ERVIN, Judge.


Defendant Robert Alfonzo Clapp appeals from judgments entered based upon his convictions for committing a sexual offense against a 13, 14, or 15 year old child and taking indecent liberties with a student while acting as a first responder.  On appeal, Defendant argues that the trial court erred by refusing to instruct the jury concerning the law of accident, precluding Defendant from eliciting evidence tending to show that Defendant did not have an unnatural lust or sexual interest in children, and refusing to instruct the jury

concerning the use of evidence tending to show Defendant's character for honesty and trustworthiness for substantive purposes. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

### 1. State's Evidence

On 23 March 2011, H.D.[1] was a fifteen-year-old freshman at Walter Williams High School. At that time, Defendant served as a first responder at Walter Williams. Individuals acting as first responders, who had previously been known as athletic trainers, were supposed to be present at practices in order to assess injuries, determine if additional medical services were needed, and assist student athletes in addressing problems associated with actual and potential injuries by performing such functions as taping ankles, stretching sore muscles, and providing ice. The compensation that Defendant received was provided by funds supplied to the Alamance County schools and the Walter Williams booster club.

---

[1]H.D. will be referred to throughout the remainder of this opinion as Hailey, a pseudonym used for ease of reading and to protect H.D.'s privacy.

Hailey ran cross country during her freshman year and participated in outdoor track during her freshman and sophomore years. As a result of the fact that she had sustained injuries during both the cross country and track seasons, Hailey sought assistance from Defendant after her cross country and track coach, Brian Smith, told her to be stretched by Defendant. In accordance with that instruction, Defendant periodically stretched Hailey in the field house.

On 23 March 2011, Defendant approached Hailey and inquired about the status of her ankle injury. After Defendant asked Hailey if she wanted to be stretched, Hailey agreed to allow Defendant to stretch her ankle and followed Defendant to the stretching room in the field house. At that time, Hailey was wearing loose running shorts that included built-in underwear and an additional pair of underwear.

After the two of them arrived in the field house, Defendant asked Hailey to remove her socks and shoes and began bending Hailey's foot back and forth. During that process, Defendant asked Hailey if she was still experiencing pain as the result of an earlier hip injury. After Hailey stated that her hip occasionally hurt when she ran, Defendant told Hailey that he would stretch her hip in addition to her ankle.

As Hailey laid on her back, Defendant stretched Hailey's leg in two different ways. In one instance, Defendant lifted Hailey's leg up and pushed it towards her chest using her foot. In the other instance, Defendant had Hailey curve her leg and then pushed the leg to the side. While Defendant performed these stretches, he massaged the inner portion of Hailey's leg at the point where her thigh met her torso using two or three fingers while instructing Hailey to let him know if she experienced pain. As he massaged Hailey's leg, Defendant mentioned that he had to leave shortly in order to sell tickets to the baseball game.

At some point during the leg stretching process, Defendant began massaging an area near her vagina underneath both of the pairs of underwear that Hailey was wearing. As he did so, Defendant inserted his finger or thumb into the area in or around Hailey's vagina on two different occasions. On the first of these occasions, one of Defendant's fingers went to the side of the lips of Hailey's vaginal opening. On the second of these two occasions, Defendant's finger penetrated Hailey's vagina. Defendant made no response after Hailey mumbled, "Watch your fingers." In light of Defendant's silence, Hailey reiterated, "Watch your fingers." Although Defendant removed his fingers from the area around Hailey's vagina after the making of the

second statement, he continued to make massaging motions beneath Hailey's underwear.

The stretching and massaging process involving Defendant and Hailey lasted for approximately thirty to forty-five minutes. During that time, a number of other people entered the field house in order to ask Defendant to provide them with tape or ice. At such times, Defendant would hold brief conversations with the new arrivals while moving his hand from beneath Hailey's underwear to a location on Hailey's thigh or knee. The stretching and massaging process ended when Defendant was summoned to help sell tickets to the baseball game.

After she left the field house, Hailey told her friend, T.H.,[2] that Defendant had touched her "in places" and moved his fingers beneath her underwear. Although Teresa insisted that the incident be reported to Mr. Smith, Hailey was too embarrassed to tell Mr. Smith what had happened. As a result of the fact that Mr. Smith was involved in a romantic relationship with the mother of another student named R.B.,[3] Teresa and Hailey decided to ask Rachel to speak with Mr. Smith instead. After

---

[2]T.H. will be referred to throughout the remainder of this opinion as Teresa, a pseudonym used for ease of reading and to protect T.H.'s privacy.

[3]R.B. will be referred to throughout the remainder of this opinion as Rachel, a pseudonym used for ease of reading and to protect R.B.'s privacy.

Rachel spoke with Mr. Smith, Hailey told him that Defendant had touched her vagina.

After returning home, Hailey met with investigating officers, told them what had happened, and stated that another girl on the track team, whom she identified as A.B.,[4] had had a similar experience with Defendant. On the same evening, Detective Steven Reed of the Alamance County Sheriff's Department interviewed Defendant, who denied having engaged in the conduct that Hailey had described and asserted that any contact that he might have had with Hailey's vagina would have been the result of an accident.

In the fall of 2010, Amy was a sixteen-year-old junior at Walter Williams who was experiencing pain as the result of an earlier groin injury. For that reason, Amy asked Defendant to stretch her. At the time that Defendant and Amy went to the field house in order to complete the stretching process, Amy was wearing yoga shorts and underwear. After the two of them reached the field house, Defendant stretched Amy's leg in three different ways. First, Defendant lifted Amy's leg. Secondly, Defendant had Amy push back with her lifted leg while the other

---

[4]A.B. will be referred to throughout the remainder of this opinion as Amy, a pseudonym used for ease of reading and to protect A.B.'s privacy.

leg remained on the table. Finally, as Amy remained seated, Defendant pushed her knee towards her chest.

While Defendant stretched Amy's leg, he used his hand to massage the muscles in that appendage. As he did so, Defendant's fingers went beneath Amy's underwear. Although Defendant's fingers touched the interior of the lips of Amy's vaginal opening, he did not touch the vicinity of Amy's vagina in any other way. As she left the training room, Amy told a member of the coaching staff that Defendant was a "creep" without describing what he had just done to her. Amy did not report the details of Defendant's conduct to anyone because she was embarrassed about what had happened.

In addition, M.A.[5] testified that she had participated in soccer and volleyball during her years as a Walter Williams student. After sustaining a groin injury during her senior year, Mandy asked Defendant for advice about stretches and other exercises that she could perform. In response to this request, Defendant told Mandy to meet him in the gym on the following day. At the appointed time, Defendant took Mandy to the athletic training room instead of the gym at a time when no one else was there.

---

[5] M.A. will be referred to throughout the remainder of this opinion as Mandy, a pseudonym used for ease of reading and to protect M.A.'s privacy.

After asking Mandy to lie down on a table, Defendant stretched Mandy's groin by lifting her leg, which was in a bent position, and pushing it to the side. Subsequently, Defendant massaged Mandy's groin area while using some sort of oil. As he did so, Defendant's hands were near Mandy's "bikini line," which she described as the area in which her thigh met her torso. After massaging Mandy's groin for five or ten minutes, Defendant asked Mandy to flip over and lie on her stomach. Once she had done as he requested, Defendant massaged Mandy's lower back and upper buttocks area. As he did this, Defendant's hands went beneath Mandy's underwear.

At approximately the same time that Mandy flipped over in order to lie on her back a second time, a loud bang was heard in the locker room immediately adjacent to the athletic training room. After telling Mandy to stay in the training room, Defendant went outside to check on the origin of the noise. Although Mandy remained in the athletic training room after Defendant's departure, she got dressed. When Defendant returned, Mandy told Defendant that she needed to go to practice and left. Mandy never told anyone about Defendant's conduct due to embarrassment.

## 2. Defendant's Evidence

At the time of trial, Defendant was forty-seven years old. Defendant had become involved with the sports program at Walter Williams because his two sons wanted to play football at that institution. For that reason, Defendant began helping the football team in the summer of 2007 by filling the water cooler. After his volunteer efforts were noticed, Defendant was asked to join the staff and help the football team. Subsequently, Defendant worked with the basketball, wrestling, track, lacrosse, and cross country teams as well as the football team.

During the first year in which Defendant was compensated for his services, his title was assistant trainer. However, Defendant's job title was changed to first responder, rather than a trainer, because he did not have a four-year college degree and because the Alamance County school system did not want people who lacked four-year degrees to be referred to as assistant trainers. As a part of the process by which he served as a member of the Walter Williams athletic staff, Defendant attended injury management classes for three consecutive years, which is the maximum amount of training available to individuals in his position. Defendant served as a member of the Walter Williams athletic staff for four consecutive years.

In the autumn, Defendant's primary responsibility was to assist the football team. However, volleyball and cross country

students would ask for Defendant's assistance during that time of year as well. Although Defendant assisted student athletes both outdoors and in the field house, he generally elected to take student athletes to the field house if he needed to plug in a massaging instrument or use equipment located in that building. The door to the field house was always propped open with a steel pole in order to prevent the door from slamming on windy days. People freely entered and exited the field house during times when Defendant was assisting student athletes.

On 23 March 2011, Defendant approached a group of students to ask about their injuries. As part of that process, Defendant asked Hailey, who was standing nearby, about her ankle, which had been swollen the previous week. After Hailey indicated that she had hurt her other ankle, Defendant asked Hailey if she wanted him to stretch her ankle. After Hailey agreed, the two of them went to the field house.

Initially, Defendant checked both of Hailey's ankles and twisted and flexed the recently injured ankle for the purpose of determining the extent to which it was tight or loose. Next, Defendant spent five or ten minutes stretching Hailey's ankles. As Defendant worked, various individuals entered and exited the field house for the purpose of obtaining ice, wraps, or assistance with various injuries.

After he finished stretching Hailey's ankles, Defendant asked Hailey if she had any other injuries. In response, Hailey stated that an old right hip flexor injury had begun hurting her again. Upon receiving this information, Defendant stretched Hailey's hip by taking her right leg and pushing it towards her chest and across her left leg and body. Although Defendant placed two fingers on Hailey's right hip, Defendant kept those two fingers at the spot at which Hailey said that she was experiencing pain and never moved them from that spot.

In view of the fact that he had been trained to treat both sides of an injured student athlete's body, Defendant stretched Hailey on the left as well as on the right. After stretching the left side of her body, Defendant returned to the right side to eliminate any remaining soreness before stretching Hailey's ankles further. Defendant spent about ten to fifteen minutes stretching each of Hailey's legs. Defendant denied having ever put his fingers or thumbs into Hailey's vagina.

At the time that he received a phone call asking for help in selling baseball tickets, Defendant ended his treatment session with Hailey. As Defendant was exiting the field house, two other female student athletes asked Defendant for assistance. After assisting the two female student athletes, Defendant left to help with the baseball ticket sales.

According to Defendant, Amy was a dedicated runner who would not stop to rest even when advised to do so. Defendant acknowledged that he had assisted Amy on a couple of occasions during her freshman year. During her sophomore year, Amy suffered numerous injuries, including shin splints, a sore knee, and a recurring hip injury. As a result of the fact that Amy had sustained a hip injury, Defendant stretched her leg on occasion and saw her more than once a week. On those occasions, Defendant iced and stretched Amy and used a massaging instrument in order to relieve the effects of muscle strains and pulls. Defendant denied having ever touched Amy's genital area.

According to Defendant, Mandy approached him in order to obtain treatment for a groin injury. Prior to the date upon which this request was made, Defendant had treated Mandy for wrist, shoulder, and groin injuries. As a result of the fact that Mandy was not available for treatment at the time that she made this request, Defendant suggested that the two of them get together on the following day.

Although Mandy met with Defendant according to the agreed-upon schedule, she was in a hurry to go to practice. Even so, Defendant and Mandy went to the training room beneath the gym, where Defendant treated Mandy using a massage instrument, putting pressure where Mandy's upper thigh met her torso, and

applying ice. Mandy did not say anything to him or appear to be upset during the treatment process.

After hearing a heavy weight dropping in another room, Defendant left Mandy alone while he investigated what he had heard. Upon Defendant's return, Mandy stated she needed to get to practice and departed. When Defendant saw Mandy, Mandy thanked Defendant for his assistance. Defendant denied having ever touched Mandy's vagina.

A number of individuals associated with the athletic program at Walter Williams testified that Defendant was trustworthy and had a good reputation for honesty and truthfulness. Similarly, four female students who participated in the Walter Williams athletic program testified that Defendant was honest and truthful, with several of them also asserting that he was trustworthy.

## B. Procedural History

On 24 March 2011, a warrant for arrest charging Defendant with committing a statutory sexual offense against a 13, 14, or 15 year old child and committing a sexual offense against Hailey while acting as a coach was issued. On 31 March 2011, a warrant for arrest charging Defendant with taking indecent liberties with Amy while acting as a coach was issued. On 8 August 2011, the Alamance County grand jury returned bills of indictment

charging Defendant with committing a statutory sexual offense against a 13, 14, or 15 year old child, committing a sexual offense against Hailey while acting as a coach, and taking indecent liberties with Amy while acting as a coach.

Although the case was called for trial before Judge G. Wayne Abernathy and a jury at the 29 May 2012 criminal session of the Alamance County Superior Court, the jury was unable to reach a unanimous verdict, resulting in the declaration of a mistrial on 5 June 2012. On 11 June 2012, the Alamance County grand jury returned superseding bills of indictment charging Defendant with committing a statutory sexual offense against a 13, 14, or 15 year old child, committing a sexual offense against Hailey while acting as a coach, and committing a sexual offense against Hailey while acting as a first responder, taking indecent liberties with Amy while acting as a coach, and taking indecent liberties with Amy while acting as a first responder.

The charges against Defendant came on for trial before the trial court and a jury at the 28 January 2013 criminal session of the Alamance County Superior Court. At the beginning of Defendant's second trial, the State announced that it had elected not to proceed against Defendant on the charges alleging that he had committed a sexual offense against Hailey and had taken indecent liberties with Amy while acting as a coach. On 5

February 2013, the jury returned a verdict convicting Defendant of committing a statutory sexual offense against a 13, 14, or 15 year old child, committing a sexual offense against Hailey while acting as a first responder, and taking indecent liberties with Amy while acting as a first responder. At the conclusion of the ensuing sentencing hearing, the trial court arrested judgment in the case in which Defendant was convicted of committing a sexual offense against Hailey while acting as a first responder and entered judgments sentencing Defendant to a term of 192 to 240 months imprisonment based upon his conviction for committing a sexual offense against a child of 13, 14, or 15 years of age and to a consecutive term of 6 to 8 months imprisonment based upon his conviction for taking indecent liberties with Amy while acting as a first responder, with this sentence being suspended and with Defendant being placed on supervised probation for 24 months on the condition that he pay attorney's fees and costs, obtain a mental health assessment, have no contact with Amy, and comply with the usual terms and conditions of probation. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Substantive Legal Analysis

### A. Accident Instruction

In his first challenge to the trial court's judgments, Defendant contends that the trial court erred by failing to instruct the jury concerning the law of accident in accordance with Defendant's request. More specifically, Defendant contends that the trial court was required to submit the accident instruction that he requested given that the record contained evidence that would have supported a jury determination that Defendant had not penetrated Hailey's vagina intentionally. Defendant's contention lacks merit.

## 1. Standard of Review

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)). "[A]n error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal

arises.'" *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (quoting N.C. Gen. Stat. § 15A-1443(a)).

## 2. Appropriateness of Accident Instruction

"'[W]hen a defendant requests a special instruction which is correct in law and supported by the evidence, the trial court must give the requested instruction, at least in substance.'" *State v. Thompson*, 118 N.C. App. 33, 36, 454 S.E. 2d 271, 273 (quoting *State v. Tidwell*, 112 N.C. App. 770, 773, 436 S.E.2d 922, 924 (1993)), *disc. review denied*, 340 N.C. 262, 456 S.E.2d 837 (1995). "If a requested instruction is refused, defendant on appeal must show the proposed instruction was not given in substance, and that substantial evidence supported the omitted instruction," with "'[s]ubstantial evidence' [being] that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted) (quoting *State v. White*, 77 N.C. App. 45, 52, 334 S.E.2d 786, 792, *cert. denied*, 315 N.C. 189, 337 S.E.2d 864 (1985), and *State v. Gray*, 337 N.C. 772, 777-78, 448 S.E.2d 794, 798 (1994)).

At the jury instruction conference, Defendant requested that the trial court instruct the jury concerning the law of accident in accordance with N.C.P.J.I. 307.11, which begins by stating that "the defendant asserts the victim's injury was the

result of an accident" and indicates that, if the State failed to satisfy the members of the jury that "the injury was in fact accidental, the defendant would not be guilty of any crime even though his acts were responsible for the victim's injury." After the trial court refused to deliver the requested instruction, Defendant made no further request for the delivery of an accident instruction. During its deliberations, the jury inquired about what it should do "if there is proof beyond a reasonable doubt that penetration however slight by an object into the genital opening of a person's body occurred but the State has not proven beyond a reasonable doubt that the penetration was 'willful' and of a sexual nature." In response, the trial court instructed the jury that "[t]he words ['] of a sexual nature['] have not appeared in your instruction and you are to apply the instruction that the Court has given you"; that, "[w]ith respect to the willful[ness] question, that word doesn't appear in the instructions"; and that "the defendant's conduct must be intentional and not accidental."

Although the trial court did refuse to deliver the requested accident instruction based on the inclusion of language in N.C.P.J.I. 307.11 to the effect that "the defendant asserts" that the victim's injury was accidental in nature, Defendant's contention that the trial court's action was not

motivated by the absence of sufficient record support for the proposed accident instruction is not consistent with our reading of the record.  Instead, we read the record to reflect that the trial court refused to deliver the requested accident instruction given the complete absence of any evidence tending to show that he digitally penetrated Hailey's vagina with his fingers in an accidental manner, a determination that we believe to have been correct.

At trial, Defendant explicitly denied having inserted his finger into Hailey's vagina or touching Amy's genital area in any way.  Even so, Defendant asserts that he was entitled to the delivery of an accident instruction given the presence of other evidence contained in the record, including Detective Reed's statement that Defendant, at one point, said, "I f I did touch her in any way it was innocent and I didn't mean to do it," and Hailey's statement that "I didn't say anything though because I thought that he wasn't thinking about it like that or he didn't realize it and was only doing his job."  In spite of Defendant's assertions to the contrary, neither of these statements provide any basis for a jury determination that Defendant accidentally penetrated Hailey's vagina with his finger.  On the contrary, Defendant's statement to Detective Reed was hypothetical in nature and immediately preceded a renewed denial that Hailey's

allegations were true. Similarly, Hailey's assertion that Defendant might not have known what he was doing amounted to mere speculation about Defendant's mental state and provides no basis for a determination that Defendant accidentally penetrated Hailey's vagina with his finger. As a result, we have no hesitancy in concluding that the record simply did not support the delivery of the requested accident instruction.

Moreover, even if the trial court's decision to refrain from instructing the jury in accordance with N.C.P.J.I. 307.11 was erroneous, any such error was rendered harmless by the trial court's subsequent decision to instruct the jury with respect to the issue of accident. During its deliberations, the jury asked the trial court, among other things, what it should do if "the State has not proven beyond a reasonable doubt that the penetration was 'willful' and of a sexual nature must we still rule guilty in Count One?" Upon reviewing this inquiry, the trial court proposed that the jury be instructed that, in order to support of a finding of guilt, "the conduct -- defendant's conduct at issue must be intentional, not accidental." After Defendant indicated that he did not object to the trial court's proposal, the trial court instructed the jury that a finding that the defendant acted intentionally, rather than accidentally, was necessary in order for the jury to return a

guilty verdict. In view of the fact that the trial court explicitly told the jury during the course of its deliberations that Defendant could not be convicted if his conduct was accidental, we are unable to see how the trial court's initial refusal to instruct the jury in accordance with N.C.P.J.I. in any way prejudiced Defendant. *State v. Rogers*, 299 N.C. 597, 603-05, 264 S.E.2d 89, 93-94 (1980) (holding that any error in the trial court's initial jury instructions was cured by a correct instruction given in response to a jury inquiry). As a result, for both of these reasons, Defendant is not entitled to relief from the trial court's judgments based upon the trial court's refusal to instruct the jury with respect to the law of accident.

## B. Excluded Witness Testimony

Secondly, Defendant contends that the trial court erred by refusing to allow Scott Frazier, a former member of the Walter Williams coaching staff, to testify that he possessed the character trait of working well with children and not having an unnatural lust or desire to have sexual relations with children. More specifically, Defendant contends that the excluded evidence should have been admitted since it related to a pertinent character trait that had a special relationship to the crimes

with which he had been charged. We do not find Defendant's argument persuasive.

### 1. Standard of Review

The essential issue raised by Defendant's second challenge to the trial court's judgments is whether the testimony in question tended to show that Defendant possessed a character trait that is relevant to the matters at issue in this case. In other words, the inquiry that we are required to conduct in this instance is relevance-based in nature. Although "a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to [N.C. Gen. Stat. § 8C-1,] Rule 403, such rulings are given great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228, *appeal dismissed*, 331 N.C. 290, 416 S.E.2d 398 (1991), *cert. denied*, 506 U.S. 915, 121 S.E.2d 321, 121 L. Ed. 2d 241 (1992). As a result, we will review Defendant's challenge to the exclusion of Mr. Frazier's testimony using the loose *de novo* standard of review utilized in addressing relevance-related issues.

### 2. Admissibility of Proposed Character Evidence

According to N.C. Gen. Stat. § 8C-1, Rule 404(a)(1), "[e]vidence of a pertinent trait of [the accused's] character offered by an accused" is admissible. "The exception allowing

evidence of a 'pertinent' trait should be 'restrictively construed,' [however,] since such evidence is excluded as a general rule." *State v. Wagoner*, 131 N.C. App. 285, 293, 506 S.E.2d 738, 743 (1998) (quoting *State v. Sexton*, 336 N.C. 321, 359-60, 444 S.E.2d 879, 901, *cert. denied*, 513 U.S. 1006, 115 S. Ct. 525, 130 L. Ed. 2d 429 (1994)), *disc. review denied*, 350 N.C. 105, 533 S.E.2d 476 (1999). As a result, "an accused may only introduce character evidence of 'pertinent' traits of his character and not evidence of overall 'good character.'" *Id.* (quoting *State v. Mustafa*, 113 N.C. App. 240, 245-46, 437 S.E.2d 906, 909, *cert. denied*, 336 N.C. 613, 447 S.E.2d 409 (1994)).

This Court addressed the admissibility of similar evidence in *Wagoner*, in which we held that the trial court properly excluded evidence tending to show the defendant's "psychological make-up," including testimony that he was not a high-risk sexual offender, on the theory that such evidence, which amounted to proof of the defendant's normality, did not tend to show the existence or non-existence of a pertinent character trait. *Id.* at 292-93, 506 S.E.2d at 743. Similarly, the evidence at issue in this case, which consisted of testimony from Mr. Frazier to the effect that he saw no indication that Defendant had an unnatural lust for or sexual interest in young girls, constituted nothing more than an attestation to Defendant's

normalcy. As a result, given that the excluded testimony did not tend to show the existence or non-existence of a pertinent trait of character, the trial court did not err by excluding Mr. Frazier's testimony concerning Defendant's lack of unnatural lust for or sexual interest in young girls.

### C. Instruction Concerning Defendant's Character for Honesty and Trustworthiness

Finally, Defendant contends that the trial court erred by refusing to instruct the jury that it could consider evidence concerning his character for honesty and trustworthiness as substantive evidence of his guilt or innocence. According to Defendant, the trial court was required to deliver the requested instruction given that it constituted an accurate statement of the law arising from the evidence. We do not find Defendant's argument persuasive.

### 1. Standard of Review

As we have previously noted, arguments "challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *Osorio*, 196 N.C. App. at 466, 675 S.E.2d at 149. Thus, we will review Defendant's challenge to the trial court's refusal to instruct the jury that it was entitled to consider the evidence tending to show that Defendant was honest and trustworthy as substantive evidence of his guilt or innocence using a *de novo* standard of review.

## 2. Appropriateness of Honesty and Trustworthiness Instruction

At trial, five witnesses testified, in essence, that Defendant was honest and trustworthy. During the jury instruction conference, Defendant requested that the trial court instruct the jury in accordance with N.C.P.J.I. 105.60, which informs the jury that a person having a particular character trait "may be less likely to commit the alleged crime(s) than one who lacks the character trait" and tells the jury that, if it "believe[d] from the evidence [that the defendant] possessed the character trait" in question, it "may consider this in [its] determination of [Defendant's} guilt or innocence[.]" The trial court rejected Defendant's request.

As we have already noted, "when a request is made for a specific instruction that is supported by the evidence and is a correct statement of the law, the court, although not required to give the requested instruction verbatim, must charge the jury in substantial conformity therewith." *State v. Holder*, 331 N.C. 462, 474, 418 S.E.2d 197, 203 (1992). For that reason, the trial court would have been required to deliver the requested instruction in the event that the jury could reasonably find that an honest and trustworthy person was less likely to commit the crimes at issue in this case than a person who lacked those character traits. As the Supreme Court noted in *State v. Bogle*,

"a person is 'truthful' if she *speaks* the truth" and "is 'honest' if his *conduct*, including his speech, is free from fraud or deception." 324 N.C. 190, 202, 376 S.E.2d 745, 752 (1989). Similarly, a person is "trustworthy" if he or she is "worthy of trust; dependable, reliable." *Webster's New World College Dictionary* 1537 (4th ed. 2006). Although an individual's honesty and trustworthiness are certainly relevant to an individual's credibility, we are unable to say that a person exhibiting those character traits is less likely than others to commit a sexual offense against a child of 13, 14, or 15 years of age or to take indecent liberties with a student while acting as a first responder. *Bogle*, 324 N.C. at 202, 376 S.E.2d at 752 (stating that, since "[n]either trafficking by possession nor by transporting marijuana necessarily involves being untruthful or engaging in fraud or deception," "we hold that the traits of truthfulness and honesty are not 'pertinent' character traits to the crime of trafficking in marijuana by possession or transportation"). As a result, the trial court did not err by refusing to instruct the jury that it could consider the evidence tending to show that Defendant was an honest and trustworthy individual as substantive evidence of his guilt or innocence.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Chief Judge MARTIN and Judge McCULLOUGH concur.

Chief Judge MARTIN concurred in this opinion prior to 1 August 2014.