IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-233

Filed 19 November 2024

Wake County, No. 21CRS216048-910

STATE OF NORTH CAROLINA

v.

HORACE DEVON TEEL, Defendant.

Appeal by defendant from judgment entered 18 April 2023 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 9 October 2024.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Zachary K. Dunn, for the State.*

*Office of the Appellate Defender Glenn Gerding, by Assistant Appellate Defender Candace Washington, for defendant-appellant.*

FLOOD, Judge.

Defendant, Horace Devon Teel, appeals from the trial court's judgment finding him guilty of voluntary manslaughter. Defendant argues on appeal: (A) the trial court erred or plainly erred in failing to provide a "not guilty" mandate for the voluntary manslaughter instruction, (B) the trial court erred by ruling a hearsay statement was not an excited utterance and was therefore inadmissible, and (C) the cumulative effect of the trial court's errors deprived Defendant of a fair trial. Upon review, we conclude the trial court's failure to provide a "not guilty" mandate for the

voluntary manslaughter instruction did not prejudice Defendant's case, and the trial court did not plainly err. Further, the trial court's exclusion of the hearsay statement—although admissible under the excited utterance exception—was not prejudicial to Defendant, and as such, not reversible error. Finally, upon our review of the entire Record, we conclude the trial court did not commit cumulative error.

## I. Factual and Procedural Background

In the afternoon of 25 September 2021, Edward Eugene "Eddie" Morrow and his girlfriend, Shenee Davenport, were "planning on going out" with friends. The group had decided to go to the Rose Bar in Raleigh, where Morrow worked as a bouncer, and among the group was Davenport's brother, Marcus. The group went to the bar later that night, and upon arrival, Marcus remained in the parked car while the rest entered the bar. After approximately fifteen minutes, Marcus called Davenport by cell phone to report that he had been "jumped." All but Morrow exited the bar to help Marcus, and as Davenport approached the car driven by Marcus, she did not see him but observed "a lot of blood on" the car. Davenport eventually located Marcus in a nearby parking lot, and observed his arm was dripping blood. Davenport then received a call from Morrow; after Morrow learned what had happened, he exited the Rose Bar at approximately 2:00 a.m. to meet the group in the nearby parking lot.

Soon thereafter, Morrow began to approach the group in the nearby parking lot, whereupon Davenport "s[aw] him start tussling with . . . someone[.]" Davenport did not see who had started the fight, but observed that the other combatant was of

- 2 -

a "heavier build[,]" had long hair, and his skin tone was "about three shades darker" than Morrow's. Morrow and the other combatant then began fighting up against a car, at which point Davenport "hear[d] a gunshot and then [her] legs got weaker as [she] got scared, and then [she] went to the floor." Davenport crawled on the ground around the front of the car towards the passenger side, and saw Morrow, who was lying on his back, bloodied, and "obviously hurt." Davenport covered Morrow's body with her own, and saw a "light-skinned" black man standing over her with a gun, whom she later identified as Defendant. At this point, Defendant, and the group of three other people who were with him at the time, walked away from the scene, entered their car that was parked approximately eighty-five feet away from the scene of the fight, and drove away.

Soon after the shooting, police officers arrived on the scene; Marcus and Morrow were transported to the hospital, and near where Morrow was shot, the officers found two pistol cartridge casings—one 9-millimeter, and the other .40 caliber. After police officers searched and secured the scene of the shooting, Detective Jared Silvious of the Raleigh Police Department ("RPD") was assigned to this case; he proceeded to the hospital where Marcus and Morrow had been taken, where he observed Marcus alive but with a gunshot wound to his arm, and ascertained that Morrow had died. Detective Silvious then traveled to the Rose Bar, where he obtained and copied the surveillance footage, and ascertained from the footage the night and time of the incident.

Law enforcement examined the surveillance footage and were able to identify all four occupants of the car who fled the scene after the shooting, among whom was Defendant. Photos from the surveillance footage were given to RPD's public information office to distribute a "[b]e on the lookout" to the local news media and RPD's social networking sites. Four days later, on 30 September 2021, RPD received a call from the Spring Hope Police Department because "[t]here were some folks at the Spring Hope Police Department that wanted to identify themselves as being in those photos[,]" including Defendant.

On 25 October 2021, a grand jury issued a bill of indictment charging Defendant with first-degree murder, and on 3 April 2023, this matter came on for hearing before the trial court. During evidence, the State presented fourteen witness testimonies, including that of Davenport. The State also presented the expert testimony of Dr. Paul Yell, who had conducted an autopsy on Morrow's corpse. From the autopsy, Dr. Yell determined that Morrow had sustained two gunshot wounds— one "high on the chest on the right side," and a second "on the left lower back." The chest wound showed no signs of soot or gunpowder stippling, indicating that the gunshot came from "probably greater than two or three feet away." The entrance wound on Morrow's back, however, exhibited stippling—"abrasions from unburned gunpowder particles that are hitting the skin and causing these . . . little red injuries"—which indicated to Dr. Yell that the gunshot to the back was fired from between six inches and three feet away. As both gunshot wounds were "potentially

- 4 -

lethal," Dr. Yell listed Morrow's cause of death as multiple gunshot wounds.

After the State rested, Defendant took the stand in his own defense. Defendant testified he lived near Greenville, North Carolina, and on the night of the shooting, he had come to Raleigh with a group of friends to celebrate a birthday; among the group was Duane Tabron, Tabron's girlfriend, and Defendant's girlfriend. The group went to the Rose Bar, and before entering, Defendant and Tabron—both of whom were armed—stored their firearms in a friend's car. At around 2:00 a.m., after spending time in the Rose Bar, Defendant, Tabron, and their girlfriends left the bar; Defendant and Tabron retrieved their firearms, placing them in their waistbands. As they were walking back to their car, a man—later identified as Morrow—attacked Tabron from the back, and the pair began to fight. Then, according to Defendant's testimony: Defendant fired a "warning shot," but Morrow "persisted in attacking Tabron"; Tabron and Morrow continued to fight and eventually "hit the ground"; Defendant heard a gunshot, which made him fear for Tabron's safety; and Defendant "went over" to the combatting pair and "fired at the victim."

During Defendant's testimony, defense counsel tried to introduce a hearsay statement that Tabron had admitted to shooting Morrow, and the State objected to introduction of this statement. Outside the presence of the jury, defense counsel argued the statement was admissible as an excited utterance, and conducted a voir dire of Defendant regarding this argument:

> [Defense counsel:] All right. At some point while y'all were

> in the car and before you've driven off, does [Tabron] say something?
>
> [Defendant:] Yes, sir.
>
> [Defense counsel:] What does he say?
>
> [Defendant:] He was like, "Man, I shot him. I shot him. I ain't even mean to, but I don't know what happened." He was like, "I'm sorry. I'm sorry." He said he shot him.
>
> [Defense counsel:] How was [Tabron] acting as he was saying this?
>
> [Defendant:] He was very hysterical, in near tears.
>
> [Defense counsel:] Okay. Then what happens?
>
> [Defendant:] He . . . called his cousin on the phone and let him know what happened, and he backed up and we turned around and we left.

On voir dire by the State, Defendant confirmed that "some minutes had passed" before Tabron made this alleged statement, and during those minutes, both Defendant and Tabron ran to their car, and Tabron took a longer time to get there. After hearing from both defense counsel and the State, the trial court sustained the State's objection, ruling that Tabron's statement did not constitute an excited utterance and that Defendant "will not be allowed to say that."

Following the trial court's exclusion of Tabron's statement, the jury was brought back into the courtroom, after which Defendant was subjected to direct and cross-examination. During cross-examination, Defendant had the following colloquy with the State's attorney:

[State's attorney:] You believe that . . . [Tabron] shot . . . [Morrow]?

[Defendant:] Yeah.

[State's attorney:] So you think [Tabron] had time to pull a gun from his waistband and shoot . . . [Morrow]?

[Defendant:] It's very possible, yes.

During the charge conference, the parties discussed jury instructions, and the trial court asked the parties to "help" finalize the instructions. To expedite the process, the trial court asked the clerk to put the draft jury instructions on the courtroom screen so all parties could participate in finalizing the instructions, and provided,

> the only reason, [State attorney] and [defense counsel,] . . . we're putting it on the screen is so that with the edits, no one can say that one person did it. We all see it. Now, it is on the screen. Your question was [whether] there were some other concerns about, yes, this instruction. I threw everything in there as far as lesser includeds [sic].

The parties then discussed the lesser included offenses of first-degree murder, and the "State [was] opposed to the instruction on voluntary manslaughter" and believed that Defendant is "either guilty of first-degree murder or guilty of second-degree murder or not guilty[.]" Thereafter, the trial court instructed the parties to "each create[ and] edit the instructions dealing with" the pattern jury instructions on first-degree murder and its lesser included offenses. The following morning, the trial court recounted a number of emails sent back and forth between the parties during

the night and early morning, which demonstrated they had worked collaboratively on a set of jury instructions. The instructions were finalized, and the trial court asked both parties if they agreed to the jury instructions; defense counsel objected only to the instruction on accomplice liability. The trial court overruled this objection and asked defense counsel if he had any other objections to the instructions, to which defense counsel replied "[n]o, sir."

Following the charge conference and closing arguments, the trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and defense of a third person, and the instructions were entirely consistent with the instructions discussed and agreed upon during the charge conference. As part of these instructions, the trial court specifically provided, in relevant part:

> Defendant has been charged with first-degree murder. Under the law and evidence in this case, it is your duty to return one of the following verdicts: First, guilty of first-degree murder.
>
> Second, guilty of second-degree murder;
>
> Third, guilty of voluntary manslaughter;
>
> And fourth, not guilty.
>
> . . . .
>
> Defendant would not be guilty of any murder or manslaughter if . . . Defendant acted in self-defense of another and did not use excessive force under the circumstances.

. . . .

> [I]f you find from the evidence beyond a reasonable doubt that on or about the alleged date . . . Defendant intentionally and not in defense of others wounded the victim with a deadly weapon and thereby proximately caused the victim's death, but the State has failed to satisfy you beyond a reasonable doubt that . . . Defendant did not act in the heat of passion upon adequate provocation, it would be your duty to return a verdict of guilty of voluntary manslaughter.

While not included in its final instruction on voluntary manslaughter, the trial court, in its final instructions on first-degree murder and second-degree murder, instructed on a "not guilty" mandate for those counts.

On 17 April 2023, the jury found Defendant guilty of voluntary manslaughter, and the following day, Defendant entered a plea agreement with the State, whereby he stipulated to the existence of an aggravating factor and agreed to an active sentence of sixty-eight to ninety-four months' imprisonment. Consistent with the jury's verdict and the plea agreement, the trial court sentenced Defendant to sixty-eight to ninety-four months' imprisonment. Defendant timely appealed.

## II. <u>Jurisdiction</u>

Defendant's appeal is properly before this Court as an appeal from a final judgment of a superior court pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. <u>Analysis</u>

Defendant argues on appeal: (A) the trial court erred or plainly erred in failing to provide a "not guilty" mandate for the voluntary manslaughter instruction, (B) the trial court erred by ruling Tabron's out-of-court statement was not an excited utterance and therefore inadmissible, and (C) the cumulative effect of the trial court's errors deprived Defendant of a fair trial. We address each argument, in turn.

**A. Voluntary Manslaughter Instruction**

Defendant contends the trial court erred by failing to instruct the jury it was required to return a verdict of not guilty if the State failed to prove the elements of voluntary manslaughter beyond a reasonable doubt. Before addressing Defendant's contention, as the voluntary manslaughter instruction was consistent with the instruction agreed upon by Defendant and the State, we first consider whether the alleged instructional error was invited error, and if not, whether Defendant preserved this argument for our appellate review.

1. Invited Error and Standard of Review

As a general rule, we review jury instructions for plain error when the defendant failed to object at trial. *See State v. Hooks*, 353 N.C. 629, 633, 548 S.E.2d 501, 505 (2001) ("Having failed to object to his instruction at trial, [the] defendant did not properly preserve his issue for review; therefore, we review the record to determine whether the instruction constituted plain error."); *see also* N.C. R. App. P. 10(a)(4). Under the invited error doctrine, however, "a party cannot complain of a charge given at his request, or which is in substance the same as one asked by him,"

*Sumner v. Sumner*, 227 N.C. 610, 613, 44 S.E.2d 40, 41 (1947) (citations omitted), and a defendant who invites error "has waived his right to all appellate review concerning the invited error, including plain error review." *State v. Crane*, 269 N.C. App. 341, 343, 837 S.E.2d 607, 608 (2020) (citation and internal quotation marks omitted). While error is clearly invited when a defendant requests the instruction at issue, *see State v. McPhail*, 329 N.C. 636, 643–44, 406 S.E.2d 591, 596 (1991) (finding invited error where the defendant specifically requested the trial court read the pattern jury instruction on confessions), this Court has held that defense counsel's mere failure to object to proposed instruction does not constitute invited error.

Specifically, in *State v. Harding*, we considered whether the trial court's allegedly erroneous jury instruction constituted invited error where the defendant "failed to object, actively participated in crafting the challenged instruction, and affirmed it was 'fine.'" 258 N.C. App. 306, 311, 813 S.E.2d 254, 259 (2018). Upon review, we found the defendant's conduct did not constitute invited error, providing that,

> [e]ven where the "trial court gave a defendant multiple opportunities to object to the jury instructions outside the presence of the jury, and each time the defendant indicated his satisfaction with the trial court's instructions," our Supreme Court has not found the defendant invited his alleged instruction error but applied plain error review.

*Id.* at 311, 813 S.E.2d at 259 (quoting *Hooks*, 353 N.C. at 633, 548 S.E.2d at 505) (cleaned up); *see also State v. Chavez*, 270 N.C. App. 748, 757, 842 S.E.2d 128, 135

(2020) (finding the invited error doctrine inapplicable where the defendant "did not request the conspiracy instruction, but merely consented to it").

Here, Defendant's participation in crafting the voluntary manslaughter instruction does not amount to invited error. Defendant did not specifically request the instruction; rather, as demonstrated in the Record, defense counsel and the State worked collaboratively on the instruction, which was ultimately unobjected to by Defendant and delivered *verbatim* by the trial court. As this Court has held a challenged instruction is not invited error where the defendant failed to object to, and actively participated in, the crafting of the instruction, it cannot be said Defendant's conduct, here, constituted invited error. *See Harding*, 258 N.C. App. at 311, 813 S.E.2d at 259; *see also Chavez*, 270 N.C. App. at 757, 842 S.E.2d at 135.

As to the proper standard of review, Defendant contends this issue is properly preserved for our appellate review, as "our Courts have held that a trial court's deviation from an agreed upon pattern instruction is preserved without objection." While this is a correct statement of law, in the instant case, it is inapposite. *See State v. Jaynes*, 353 N.C. 534, 556, 549 S.E.2d 179, 196 (2001) ("[W]hen the instruction actually given by the trial court varied from the pattern language, [the] defendant was not required to object in order to preserve this question for appellate review." (citation omitted)). Defense counsel worked collaboratively with the State in crafting the voluntary manslaughter instruction, and as such, any deviation in the pattern instruction was one to which Defendant impliedly consented. *See Chavez*, 270 N.C.

App. at 757, 842 S.E.2d at 135.  Further, Defendant failed to object to the trial court's omission of a "not guilty" mandate in its voluntary manslaughter instruction, meaning he failed to preserve his argument for our appellate review, and it is therefore subject to our plain error review.  *See Harding*, 258 N.C. App. at 311, 813 S.E.2d at 259; *see also Hooks*, 353 N.C. at 633, 548 S.E.2d at 505.

To demonstrate plain error, a defendant must show that "a fundamental error occurred at trial."  *State v. Hunt*, 250 N.C. App. 238, 247, 792 S.E.2d 552, 559 (2016).  "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty."  *Id.* at 247, 792 S.E.2d at 559.

### 2. Prejudice

"Our Supreme Court has held that the failure of the trial court to provide the option of acquittal or not guilty in its charge to the jury can constitute reversible error."  *State v. McHone*, 174 N.C. App. 289, 295, 620 S.E.2d 903, 907 (2005) (citation omitted).  In *State v. Gosnell*, however, this Court concluded that the trial court did not plainly err where the trial court's first-degree murder instruction did not expressly state that the jury could find the defendant "not guilty[,]" but did expressly discuss the "not guilty" option in its second-degree murder instruction.  231 N.C. App. 106, 109–10, 750 S.E.2d 593, 595–96 (2013) ("The trial court did not commit plain error in failing to instruct that the jury would or must return a 'not guilty' verdict if it did not conclude that [the d]efendant committed first-degree murder on the basis

of premeditation and deliberation."). In reaching this conclusion, we also highlighted the significance of the verdict sheet providing a space for a "not guilty" verdict on the first-degree murder count. *Id.* at 110, 750 S.E.2d at 596; *see also State v. Calderon*, 242 N.C. App. 125, 134, 774 S.E.2d 398, 406 (2015) (finding no plain error, and noting that each verdict sheet contained a space for a "not guilty" option).

Here, upon our review of the trial court's voluntary manslaughter instruction, it appears the trial court failed to comport with the requirement of instructing the jury that it could return a verdict of not guilty if the State failed to prove the elements of voluntary manslaughter beyond a reasonable doubt. *See McHone*, 174 N.C. App. at 295, 620 S.E.2d at 907. The trial court, however, comported with this requirement in its final mandates on first-degree and second-degree murder; set forth the option of "not guilty" in other parts of its instructions, specifically providing that one of the four possible verdicts the jury may reach is "not guilty" and that "Defendant would *not be guilty* of any murder *or manslaughter* if . . . [he] acted in self-defense of another"; and included on the verdict sheet a "not guilty" option. Per the standard set forth in *Gosnell*, the presence of these factors demonstrates that the trial court's failure to provide a "not guilty" mandate in its voluntary manslaughter instruction had no probable impact on the jury's finding of guilt. 231 N.C. App. at 109–10, 750 S.E.2d at 595–96; *see also Hunt*, 250 N.C. App. at 247, 792 S.E.2d at 559. Accordingly, Defendant's case was not prejudiced, and the trial court did not plainly err. *See Hunt*, 250 N.C. App. at 246–47, 792 S.E.2d at 559.

- 14 -

**B. Excited Utterance**

Defendant next contends that Tabron's statement "[m]an, I shot him" was an excited utterance, and as such, the trial court erred and prejudicially erred in excluding the statement as inadmissible hearsay. We disagree.

This Court reviews de novo "a trial court's decision with regard to the admission of evidence alleged to be hearsay[.]" *State v. Lowery*, 278 N.C. App. 333, 338, 860 S.E.2d 332, 336 (2021) (citation and internal quotation marks omitted). "Under a *de novo* review, [this C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Clapp*, 235 N.C. App. 351, 359–60, 761 S.E.2d 710, 717 (2014) (citation and internal quotation marks omitted). Even where this Court finds the trial court's evidentiary decision was in error, however, "evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial." *State v. Wilkerson*, 363 N.C. 382, 415, 683 S.E.2d 174, 194 (2009) (citations omitted). "A defendant is prejudiced by evidentiary error when there is a reasonable probability that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Id.* at 415, 683 S.E.2d at 194 (citation and internal quotation marks omitted).

1. Evidentiary Error

Under North Carolina law, a hearsay statement is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered

in evidence to prove the truth of the matter asserted[,]" and such statements are inadmissible at trial. *Sterling v. Gil Soucy Trucking, Ltd.*, 146 N.C. App. 173, 177, 552 S.E.2d 674, 677 (2001) (citation and internal quotation marks omitted). "Numerous exceptions to the hearsay rule exist, however, so that out-of-court statements may be admissible under some circumstances[,]" and one such exception is that for "excited utterances[.]" *State v. Nicholson*, 355 N.C. 1, 35, 558 S.E.2d 109, 133 (2002) (citation and internal quotation marks omitted).

"The excited utterance hearsay exception allows admission of out-of-court statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* at 35, 558 S.E.2d at 133 (citation and internal quotation marks omitted). "To qualify as an excited utterance, the statement must relate (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *Id.* at 35, 558 S.E.2d at 133 (citation and internal quotation marks omitted). "If the facts indicate a lapse of time sufficient to manufacture a statement and that the statement lacked spontaneity, the statement is inadmissible under" the excited utterance exception. *State v. Riley*, 154 N.C. App. 692, 695, 572 S.E.2d 857, 859 (2002) (citation and internal quotation marks omitted).

In *State v. Allen*, this Court assessed whether witness statements given twenty minutes after a shooting were properly admitted into evidence under the excited utterance exception. 162 N.C. App. 587, 593, 592 S.E.2d 31, 37 (2004). In making

this assessment, we considered evidence that the witnesses were under "extreme stress" when they made their out-of-court statements, as one witness appeared to have been crying before making her statement, and the other stopped crying just before making hers. *Id.* at 593, 592 S.E.2d at 37. Based on this evidence, and as the witnesses' "statements were made only twenty minutes after the shootings and the statements related to the startling events at issue," the statements were properly admitted under the excited utterance exception. *Id.* at 593, 592 S.E.2d at 37. Likewise, in *State v. Pickens*, our Supreme Court concluded a hearsay statement made at a "still-chaotic scene" was properly admitted under the excited utterance exception, where the hearsay declarant "had just witnessed the shooting of a child and was still experiencing the effects of the extremely startling event. There was no time to reflect on his thoughts or fabricate a story between the . . . shooting and the statement, thus making the declaration spontaneous." 346 N.C. 628, 644–45, 488 S.E.2d 162, 171 (1997).

Here, in consideration of the first factor for an excited utterance statement—that it relates a sufficiently startling experience suspending reflective thought—Record evidence demonstrates Tabron made the hearsay statement in the minutes after being involved in a lethal shooting. Per our assessments of the excited utterance exception in *Allen* and *Pickens*—where the hearsay declarants made their statements after wistnessing a shooting—the first factor is certainly met. *See Allen*, 162 N.C. App. at 593, 592 S.E.2d at 37; *see also Pickens*, 346 N.C. at 644–45, 488 S.E.2d at 171.

Next, as to the second factor—that the statement be a spontaneous reaction, not resulting from reflection or fabrication—per Defendant's testimony, following the shooting, it took "some minutes" for Defendant and Tabron to run from the scene of the shooting to their vehicle, and when Tabron made the hearsay statement he was "very hysterical, in near tears." Again, per *Allen*—where the hearsay statements were made twenty minutes after the shooting, the declarants were under "extreme stress," and they were crying just before making their statements—and *Pickens*—where the hearsay statement was made at a "still-chaotic" scene, and the declarant had just witnessed a shooting—Tabron's hearsay statement was certainly one of spontaneity. *See Allen*, 162 N.C. App. at 593, 592 S.E.2d at 37; *see also Pickens*, 346 N.C. at 644–45, 488 S.E.2d at 171. Although "some minutes" had passed between the shooting and the hearsay statement, Tabron was "still experiencing the effects of the" shooting, and the second factor is therefore met. *Pickens*, 346 N.C. at 644–45, 488 S.E.2d at 171; *see also Allen*, 162 N.C. App. at 593, 592 S.E.2d at 37.

As Tabron's hearsay statement meets both requirements to constitute an excited utterance, we conclude his statement was "one related to a startling event or condition made while . . . under the stress of excitement caused by the event or condition[.]" *See Nicholson*, 355 N.C. at 35, 558 S.E.2d at 133. Tabron's hearsay statement falls squarely under the excited utterance exception, and as such, it was error for the trial court to exclude the statement as inadmissible hearsay. *See id.* at 35, 558 S.E.2d at 133; *see also Clapp*, 235 N.C. App. at 359–60, 761 S.E.2d at 717.

## 2. Prejudice

Having concluded the trial court committed evidentiary error in excluding Tabron's hearsay statement, we now must consider whether the error prejudiced Defendant. *See Wilkerson*, 363 N.C. at 415, 683 S.E.2d at 194. Upon our de novo review of the Record, we discern no prejudice. *Lowery*, 278 N.C. App. at 338, 860 S.E.2d at 336.

In addition to Defendant's testimony, the State presented testimony from Davenport, wherein she provided that, at some point during the fight, Morrow was shot, and that she saw Defendant standing over Morrow's body, armed with a gun. Further, Defendant and Morrow each possessed a firearm at the time of the shooting; the uncontroverted evidence demonstrates that Morrow was shot once from the front and once from the back with two firearms of different calibers—one chambered in 9mm and the other in .40 caliber; the front wound was from a bullet fired from a distance of "greater than two or three feet away," and the back wound from a bullet fired from six inches to three feet away; Dr. Yell testified that the front wound and the back wound were each "potentially lethal"; and Defendant himself admitted to shooting Morrow. From this evidence, a reasonable jury could conclude that Defendant had committed voluntary manslaughter of Morrow, and as such, there is not a reasonable probability that, but for the trial court's exclusion of Tabron's hearsay statement, the outcome of the proceeding would have been different. *See Wilkerson*, 363 N.C. at 415, 683 S.E.2d at 194; *see also State v. Simonovich*, 202 N.C.

App. 49, 53, 688 S.E.2d 67, 71 (2010) ("Voluntary manslaughter is the killing of another human being without malice and without premeditation and deliberation under [1] the influence of some passion or [2] heat of blood produced by adequate provocation." (citation and internal quotation marks omitted)). The trial court's exclusion of the testimony was not reversible error.

## C. Cumulative Error

Defendant lastly contends that, even if the trial court's errors are not prejudicial on their own, the combined effect of these errors prejudiced Defendant and violated his right to a fair trial. We disagree.

Under the cumulative error doctrine, "[c]umulative errors lead to reversal when taken as a whole they deprived the defendant of his due process right to a fair trial free from prejudicial error." *Wilkerson*, 363 N.C. at 426, 683 S.E.2d at 201 (citation and internal quotation marks omitted) (cleaned up). As explained above, the only error committed by the trial court was its exclusion of Tabron's hearsay statement, and this error was not prejudicial. Further, even if the trial court did err in failing to provide a "not guilty" mandate in its voluntary manslaughter instruction, upon our review of the entire Record, and comparing the evidentiary error and alleged instructional error to the State's evidence, we conclude Defendant was not deprived of his due process right to a fair trial. *See id.* at 426, 683 S.E.2d at 201 ("We have reviewed the record as a whole and, after comparing the overwhelming evidence of [the] defendant's guilt with the evidence improperly admitted, we conclude that,

taken together, these errors did not deprive [the] defendant of his due process right to a fair trial."). The trial court did not cumulatively err.

## IV. **Conclusion**

Upon our review, we conclude that the trial court's failure to instruct on the "not guilty" option for voluntary manslaughter did not prejudice Defendant's case, and as such, the trial court did not plainly err. We further conclude that, although the trial court's exclusion of Tabron's hearsay statement was error under the excited utterance exception, the exclusion did not prejudice Defendant, and the trial court did not reversibly err. Finally, upon our review of the entire Record, we conclude the trial court did not cumulatively error.

NO ERROR and NO PLAIN ERROR.

Judges TYSON and GORE concur.